## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| CM VANTAGE SPECIALTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 4:18-cv-01749-JMB |
| | ) | |
| NEPHRITE FUND I, LLC | ) | |
| D/B/A AMBER GLEN APARTMENTS, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, CM Vantage Specialty Insurance Company, by and through undersigned counsel, and for its Memorandum in Support of its Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7-4.01, states as follows:

### PRELIMINARY STATEMENT

Plaintiff CM Vantage Specialty Insurance Company ("CM Vantage") issued an insurance policy to Defendant Nephrite Fund I, LLC d/b/a Amber Glen Apartments ("Nephrite") in August 2017, policy number CMV-PRP-0004939-01 (the "policy") for the apartment complex, Amber Glen Apartments. However, this policy was issued based upon misrepresentations committed by Nephrite during the application process. Specifically, Nephrite falsely represented that there were no tenants receiving subsidized housing residing at the apartment complex, as well as that there were no prior losses. After the March 1, 2018 fire, which forms the basis for the claims at issue in this matter, CM Vantage discovered for the first time that in fact numerous tenants residing at the complex received housing subsidies, both from Save, Inc., as well from the

Housing Authority of Kansas City.  These misrepresentations are material both in the insurance industry, as well as to CM Vantage, because the truthful disclosure of this information would have resulted in CM Vantage charging Nephrite a higher premium for the policy.  Additionally, CM Vantage also discovered that Nephrite had suffered a significant prior mold loss in Apartment 4 of Building 9815, that was not disclosed during the application process.  This misrepresentation is also material because the truthful disclosure of this prior loss would have resulted in CM Vantage refusing to write this risk and the policy would not have been issued.

Nephrite also committed material misrepresentations during the claim by seeking to recover property damages for Apartment 4, even though this unit was already damaged by mold and had been gutted down to the studs prior to the fire.  Additionally, Nephrite is still seeking to recover lost rents for Apartment 4 even though the apartment was vacant at the time of the fire.  Both of these constitute material misrepresentations in the claim.

Following the fire, Nephrite was required to cooperate with CM Vantage's investigation into the loss, including by providing a proof of loss, providing requested documents and records and submitting to an Examination Under Oath ("EUO").  However, Nephrite undisputedly failed to cooperate by refusing to comply with each of these conditions under the policy.  Such failures to cooperate constitute yet another breach of the policy's conditions.

Nephrite breached the policy with CM Vantage through its material misrepresentations in the application process, the material misrepresentations in the claim and the failures to cooperate.  Thus, the policy is void and no coverage is owed for any of Nephrite's claims.

## STANDARD

Summary judgment should be granted when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *Boerner v. Brown*

& *Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001).  Moreover, "Rule 56(c) mandates the entry of summary judgment, after an adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in his favor.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op.*, 838 F.2d 268, 273 (8th Cir. 1988).  Once this burden is discharged, if the record bears out that no genuine dispute exists, the burden shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  After the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists.  Fed.R.Civ.P. 56(e).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Indeed, it must be established that there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for him.  *Anderson*, 477 U.S. at 249; *Catrett*, 477 U.S. at 324.

## ARGUMENT

### I.    Principles of Contract Interpretation

In interpreting an insurance contract, courts read the policy as a whole to determine the parties' intent.  *Dibben v. Shelter Ins. Co*., 261 S.W.3d 553, 556 (Mo. Ct. App. 2008) (*citing Missouri Employers Mutual Ins. Co. v. Nichols*, 149 S.W.3d 617, 625 (Mo. Ct. App. 2004)). Courts then give effect to this intent by enforcing the contract as written, according to the plain

and ordinary meaning of its language.  *Id.* (*citing Missouri Employers Mutual Ins. Co*., 149 S.W.3d at 625).  Words or phrases in an insurance contract must be interpreted in the context of the policy as a whole and not considered in isolation.  *Long v. Shelter Ins. Co.*, 351 S.W.3d 692, 696 (Mo. Ct. App. 2011) (*quoting Haggard Hauling and Rigging Co. v. Stonewall Ins. Co*., 852 S.W.2d 396, 399 (Mo. Ct. App. 1993)).  Furthermore, in interpreting an insurance contract, courts endeavor to give each provision a reasonable meaning and avoid an interpretation that renders any provision useless or redundant.  *Dibben,* 261 S.W.3d at 556. (*citing Wildflower Community Association, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. Ct. App. 2000)).

"Definitions, exclusions, conditions, and endorsements are necessary provisions in insurance policies.  If they are clear and unambiguous within the context of the policy as a whole, they are enforceable."  *Yager v. Shelter Gen. Ins. Co*., 460 S.W.3d 68, 71 (Mo. Ct. App. 2015) (*quoting Allen v. Continental W. Ins. Co*., 436 S.W.3d 548, 553-54 (Mo. banc 2014)).

## II.     Nephrite committed material misrepresentations in the application, which void the policy and preclude coverage for its claims.

### A.     Material misrepresentations committed by an insured during the application process provide a sufficient basis for voiding an insurance policy.

Under Missouri law, an insurance policy application constitutes an offer to the insurer to enter into a contract with the applicant.  *Bearden v. Countrywide Cas. Co.*, 352 S.W.2d 701, 705 (Mo. Ct. App. 1961).  The information provided in the application is "intended to be relied upon by [the insurer], and become[s] a part of the contract when accepted."  *Id.*  Material misrepresentations in an insurance application render a policy void.  *Columbia Mut. Ins. Co. v. Martin*, 912 S.W.2d 640, 642 (Mo. Ct. App. 1995).

Missouri has recognized the trend "to restrict the rule requiring diligence in persons to whom representations are made, and to condemn the falsehood of the person making the

representation, rather than the credulity of the victim." *Reis v. Peabody Coal*, 997 S.W.2d 49, 62 (Mo. Ct. App. 1999). Additionally, there is a duty to disclose arising when one party to a transaction has superior knowledge that is not within the fair and reasonable reach of the other, such that the failure to reveal material information constitutes concealment. *VanBooven v. Smull*, 938 S.W.2d 324, 328 (Mo. Ct. App. 1997).

"Where the answers in the application are complete on their face, the insurer is not obliged to make further inquiry, and absent knowledge of the true facts is not estopped to avoid the policy." *Weekly v. Missouri Property Ins. Placement Facility*, 538 S.W.2d 375, 379 (Mo. Ct. App. 1976). Furthermore, an applicant who is able to read "is legally bound to know the contents of the application [he] signed, whether [he] read it or not . . . and this is not affected by the fact that [he] relied upon or trusted the agent to prepare the application for the policy." *Miller v. Plains Ins. Co.*, 409 S.W.2d 770, 772-773 (Mo. Ct. App. 1966).

"Insurers and underwriters are entitled to rely upon the responses and information provided by potential insureds and to presume the insured has provided responses that are true and complete." *Cedar Hill Hardware and Const. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 349 (8th Cir. 2009). "The materiality of a misrepresentation in an insurance application is determined by whether the fact, if stated truthfully, might reasonably influence an insurance company to accept or reject a risk or to charge a different premium." *Haynes v. Missouri Prop. Ins. Placement Facility*, 641 S.W.2d 497, 499 (Mo. Ct. App. 1982).

In Missouri, an insurance company need not demonstrate fraud and may void a policy on the basis of a material misrepresentation in the application for insurance when:

> (1) the representation is warranted to be true, (2) the policy is conditioned upon its truth, (3) the policy provides that its falsity will avoid the policy, or (4) the application is incorporated into and attached to the policy.

*Shirkey v. Guarantee Trust Life & Ins.*, 141 S.W.3d 62, 67 (Mo. Ct. App. 2004) (*quoting Continental Cas. Co. v. Maxwell,* 799 S.W.2d 882, 888 (Mo. Ct. App. 1990)).   A material misrepresentation is proved when it is shown that any one of these four requirements is met.  *Id*. (*citing Cent. Bank of Lake of the Ozarks v. First Marine Ins. Co*., 975 S.W.2d 222, 225 (Mo. Ct. App. 1998)).

Furthermore, the Eighth Circuit in *Cedar Hill Hardware* rejected the insured's argument that an insurer must prove the elements of fraud, including intent to deceive and reliance, to void a policy where the policy provides it is rendered void by a misrepresentation or concealment. *Cedar Hill Hardware and Const. Supply, Inc.*, 563 F.3d at 346.  Thus, even if the representations are innocently made, the insurer may still void the insurance policy.  *Dixon v. Business Men's Assur. Co. of Am.,* 285 S.W.2d 619, 625 (Mo. 1955).

Misrepresentations in the application have been found to void the policy and preclude coverage for all claims being made based upon similar policy language to that contained in Nephrite's policy, which provides that the policy is void if the insured misrepresents a material fact concerning the covered property.  SOF ¶177.

In *Fantasy Bus*, the Court held that a provision stating an insured's concealment or misrepresentation will void the policy meets prong (3) of the test outlined in *Shirkey* and *Maxwell*, rendering a policy void, without a showing of fraud.  *Northland Ins. v. Fantasy Bus Service*, 1996 WL 115515, *5-6 (E.D. Mo. 1996).  In *Fantasy Bus*, the policy provided it "is void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning: a. This Coverage Form; b. The covered auto; c. Your interest in the covered auto; or d. A claim under this Coverage Form."  *Fantasy Bus*, 1996 WL 115515 at *6.  Based on this provision, the Court determined, "[c]learly . . . the policy provides that falsity through either

6

concealment or misrepresentation will void the policy." *Id*. The Court held the insurer did not have to prove fraud and the policy was void due to the misrepresentations in the application. *Id*.

Therefore, where a policy provides it is void if an insured conceals or misrepresents a material fact, the policy is void, without a showing of fraud, if the insured concealed or misrepresented a material fact in the application. *Id*. S*ee also JAM v. Nautilus Ins.*, 128 S.W.3d 879, 890 n.2 (Mo. Ct. App. 2004) (Where policy provided it is void if the insured "intentionally conceal[ed] or misrepresented a material fact concerning . . . [his] interest in the Covered Property," referring to misrepresentation in the application, "[t]he plain language of the provision clearly states a material misrepresentation voids the policy . . . .").

### B. Nephrite committed material misrepresentations by representing that there were no prior losses and no tenants receiving subsidized housing.

### i. Introduction

In obtaining the insurance with CM Vantage, Nephrite used an independent broker, Lonnie Kitchen from Franklin Street Insurance, who acted on Nephrite's behalf and shopped around with multiple insurance companies in order to obtain the best policy for Nephrite. SOF ¶¶10-12.[1] As part of this process, Mr. Sheehy, on behalf of Nephrite, provided information about Amber Glen Apartments, which information was then used by Mr. Kitchen to fill out the applications, including the AmRisc Application and the signed Commercial Insurance Application, that were sent to CM Vantage. SOF ¶¶13-14. Importantly, Mr. Sheehy did not inform Mr. Kitchen that Apartment 4 in Building 9815 ever had water damage or mold damage, and also communicated to him that there were no HUD or other subsidized units at Amber Glen

---

[1] When a broker, such as Mr. Kitchen, acts on behalf of an insured, such as Nephrite, to shop around for insurance among multiple insurance companies, they are the agent of the insured. *Mark Andy, Inc. v. Hartford Fire Ins. Co.*, 229 F.3d 710, 717 (8th Cir. 2000). "Any mistakes made by the broker are attributable to its principal, the insured, and not to the insurance company." *Id*.

Apartments, and this information was relayed by Mr. Kitchen to CM Vantage.  SOF ¶¶29, 40 & 59.

### ii.     Nephrite represented that there were no prior losses

No information about prior losses or damage was provided by Nephrite on the AmRisc Application, the unsigned Commercial Insurance Application, or the signed Commercial Insurance Application, despite the fact that each of these documents expressly requested such information, and Mr. Sheehy represented that there was none.  SOF ¶¶16-17, 21-23, 43, 49, 52. On the signed Commercial Insurance Application, Nephrite expressly represented that there was no loss history, including claims, losses or occurrences that may give rise to claims, for Amber Glen Apartments, which confirmed the lack of any prior losses or claims previously communicated by Nephrite to CM Vantage.  SOF ¶¶45-49.  It is important to note that a claim and loss are not synonymous, as an insured could sustain a loss causing damage, but elect not to file a claim with its insurer, which is why the application distinguishes between claims, losses and occurrences that may give rise to claims.  SOF ¶51.

### iii.     Nephrite represented that there was no subsidized housing

On the AmRisc Application, which specifically asks about tenants receiving subsidized housing, Nephrite represented that there were no tenants receiving subsidized housing and "0%" is filled in under "% Subsidized" for each building at Amber Glen Apartments.  SOF ¶¶18-19. Nephrite also represented on the Habitational Supplemental Questionnaire, completed and signed by Nephrite as part of the application process, that there is no subsidized housing, HUD or otherwise, and that all tenants were middle class.  SOF ¶¶24-27.  Nephrite's own expert acknowledges that the presence of tenants receiving subsidized housing is something Mr. Sheehy should have known because it involves tenants moving into his complex.  SOF ¶31.

### iv.     CM Vantage relied upon Nephrite's representations in issuing the policy

An insurance policy application constitutes an offer to the insurer to enter into an account with the applicant.  SOF ¶55.  In signing and/or submitting the application materials, Mr. Sheehy had the opportunity to read, review and make any changes or corrections that he wanted and also represented that the information provided was true, correct, complete and did not misrepresent, misstate or omit any material facts.  SOF ¶¶15, 28 & 53-54.  Nephrite understood and expected that the information provided on the application forms was material and would be provided to and relied on by insurance companies, such as CM Vantage, to determine whether to write the risk and what premium to charge.  SOF ¶¶20, 67-68.  The insurance company and its underwriters need to, can and did rely upon information provided by the insured and its representatives in the application process to underwrite the risk and issue the policy.  SOF ¶69.

In reliance on the application materials, CM Vantage reviewed the file and determined that it was acceptable to quote the risk as market rate apartments, which resulted in the policy being issued to Nephrite.  SOF ¶¶41-42.  After the policy was issued, on March 1, 2018, a fire occurred at Amber Glen Apartments in Apartment 8 of Building 9815.  SOF ¶¶70-71.  Only after the fire did CM Vantage become aware that Nephrite provided inaccurate information during the application process by not disclosing any tenants receiving subsidized housing, as well as not disclosing prior losses, including a prior kitchen fire and a water loss that caused mold damage, all of which was information that would have impacted CM Vantage's decision to issue the policy.  SOF ¶¶75-76.

### v.      There were prior losses at Amber Glen Apartments that were not disclosed

There was a prior mold loss which developed as a result of a water loss in Apartment 4 of Building 9815 that occurred in 2016 and caused damage to the property.   SOF ¶¶88-89.

Although no claim may have been submitted for these damages, this still qualifies as an occurrence that may give rise to claims and thus should have been disclosed. SOF ¶90.

The City of Raytown Building Inspector, William Andrew Boyd, documented the mold in Apartment 4 and considered it to be one of the worst cases of mold he had seen in his 30 year career, as the mold was present on the sheetrock from the floor to the ceiling covering several walls. SOF ¶¶91-93. Mr. Sheehy admitted there had been mold in Apartment 4 and that was why the drywall had been removed prior to the fire. SOF ¶99. In addition to gutting Apartment 4 to the studs, Nephrite also removed all kitchen cabinets, appliances and plumbing fixtures, as well as the furnace. SOF ¶106. Despite Nephrite removing the sheetrock, the mold and fungus remained, as evidenced by the growth on the carpet and even over the bottom plates of the studs, which only could have occurred after the sheetrock was removed, which was prior to the fire. SOF ¶¶107 & 111. In order to fully remediate the mold and place Apartment 4 in a livable condition would have cost between $17,000 and $35,000. SOF ¶102.

There was also a prior fire in Apartment 12 of the connected building and, although the General Manager, Jesse Davila, represented that this occurred a few months before the March 1, 2018 fire, the City of Raytown Fire Department Report documents that this occurred in 2006, before the application process with CM Vantage. SOF ¶¶115-16.

### vi.     Prior losses are material in the insurance industry and to CM Vantage

An insurer is entitled to accurate loss and claim information because no information requested in the underwriting process is more material to the insurer than the cause, number and dollar amount of the insured's prior losses and claims, as well as the measures the insured has taken to correct, repair or remediate the property that had been damaged. SOF ¶¶56-57.

A water loss may give rise to a claim and should be reported during the procurement of insurance because this is material information for an insurance company to consider and it needs to have the opportunity to decide whether to accept or pass on a risk.   SOF ¶¶60-61. Additionally, the presence of mold is a crucial material fact in the underwriting of a habitational building.  SOF ¶62.  A fire of any size and a large mold loss that resulted in $30,000-$35,000 in damages are both significant losses that need to be reported to CM Vantage.  SOF ¶58.

If CM Vantage was made aware of a prior mold problem in Apartment 4 of Building 9815, specifically in the walls, it would have declined to insure the risk at all because there could be mold in other units as mold is ubiquitous and does not stay in one unit.  SOF ¶¶63-64 & 66. This is CM Vantage's common practice with respect to prior mold because this is a serious issue extending beyond property to liability and life safety issues.  SOF ¶65.

### vii.    Tenants at Amber Glen Apartments received housing subsidies

When the insurance was obtained with CM Vantage, there were numerous tenants receiving housing subsidies to pay their monthly rent, but this information was not disclosed to CM Vantage during the application process. SOF ¶79.  In addition to his representations during the application process, Mr. Sheehy continued to maintain even at the time of his deposition that there have been no tenants receiving subsidized housing at Amber Glen Apartments since Nephite began managing the property in 2016.  SOF ¶30.  However, such representations, both in the application process and during the litigation, are manifestly false.

As an initial matter, it should be noted that despite Mr. Sheehy's repeated protestations that there were no tenants receiving subsidized housing at Amber Glen Apartments, the very first page of the standard lease utilized at the property contains a section to be filled in for the agency, caseworker and phone number for the entity assisting in paying the tenant's rent.  SOF ¶77.  The

11

presence of this information and questions on the first page clearly establishes that providing housing to tenants whose rent was subsidized was standard operating procedure at Amber Glen Apartments.  SOF ¶78.

The leases and supporting documents, signed prior to the submission of application materials to CM Vantage, establish that the rent of 12 tenants, including the tenant residing in Apartment 8 of Building 9815 where the fire occurred, was being paid by Save, Inc., which is a subsidy, when Nephrite obtained the policy with CM Vantage.  SOF ¶80.  The fact that Save, Inc. provided such rental assistance subsidies to these tenants residing at Amber Glen Apartments was not disclosed to CM Vantage during the application process.  SOF ¶86.

In addition to those tenants whose rent was subsidized by Save, Inc., when Nephrite obtained insurance with CM Vantage, the rent of seven other tenants was being paid by the Housing Authority of Kansas City, whose subsidies were granted as part of the Section 8 Tenant-Based Assistance Housing Choice Voucher Program of The U.S. Department of Housing and Urban Development.  SOF ¶82.  The Housing Authority of Kansas City describes its Voucher Program as "a rental assistance program funded by the U.S. Department of Housing and Urban Development (HUD) to assist very low-income families, the elderly, and the disabled afford decent, safe, and sanitary housing in the private market."  SOF ¶84.  The fact that these tenants residing at Amber Glen Apartments were receiving HUD or Section 8 housing subsidies was not disclosed to CM Vantage during the application process.  SOF ¶85.

Remarkably, despite claiming not to be aware of any tenants receiving subsidized housing, numerous documents referencing Save, Inc. and the Housing Authority of Kansas City were signed by Mr. Sheehy prior to the submission of application materials to CM Vantage. SOF ¶¶81 & 83.  Even Nephrite and its expert, Mr. Roinestad, concede that at a minimum, HUD

and Section 8 housing constitutes subsidized housing and Mr. Roinestad even admits that there were multiple tenants receiving Section 8 subsidies when the insurance was procured from CM Vantage.  SOF ¶¶32 & 87.  However, the presence of these tenants was not disclosed to CM Vantage during the application process.  SOF ¶¶34, 79 & 85-86.

### viii.   The presence of tenants receiving housing subsidies is material in the insurance industry and to CM Vantage

Although not disclosed, the presence of subsidized housing is material in the insurance industry, as well as to CM Vantage, with respect to underwriting the risk; and, thus constitutes information that should be provided to the insurance company.  SOF ¶¶33-34.  Pursuant to the custom in the insurance industry, if a property has tenants receiving subsidized housing, the insurance company has the right not to write the risk or to charge a higher premium.  SOF ¶35. Specifically, had CM Vantage been made aware that there were tenants receiving subsidized housing at Amber Glen Apartments, a higher base rate would been started with, which would have resulted in a premium increase of $20,000.  SOF ¶¶36-37.  This increase occurs because it is known in the insurance industry that subsidized housing causes more claims and those properties are higher risk and are not as well taken care of by the owners.  SOF ¶¶38-39.

### C.   Conclusion

Nephrite committed multiple misrepresentations in the application that were only discovered after the fire and which have now been confirmed.  Nephrite repeatedly represented that there were no prior losses at Amber Glen Apartments.  However, there was a major mold loss caused by water that would have cost Nephrite upwards of $35,000 had it sought to fully repair these damages.  This was not disclosed to CM Vantage during the application process as Nephrite represented there were no prior losses, which information is material to CM Vantage,

well as in the insurance industry.  If truthful information had been disclosed, then CM Vantage would have declined to write this risk.

Nephrite also represented that there was 0% subsidized housing at Amber Glen Apartments.  However, there were numerous tenants receiving various types of subsidies, including from Save, Inc. and the Housing Authority of Kansas City.  This misrepresentation is even more egregious because Mr. Sheehy on behalf of Nephrite signed numerous documents establishing that tenants residing at Amber Glen Apartments were receiving subsidies and even admits that HUD or Section 8 rental assistance constitutes a subsidy, but yet he still failed to disclose this information to CM Vantage.  This information is material both in the industry, as well as to CM Vantage, because it would have resulted in CM Vantage charging Nephrite a higher premium for the policy.

Both of these misrepresentations in the application process are material not only to CM Vantage specifically, but also in the insurance industry as a whole.  Thus, pursuant to the conditions in Nephrite's policy with CM Vantage, these misrepresentations with respect to Amber Glen Apartments should void the policy and preclude any coverage for Nephrite's claimed losses.  SOF ¶177.

### III. Nephrite committed material misrepresentations in the claim, which void the policy by seeking to recover property damages and lost rents for Apartment 4 when the apartment was already damaged by mold and was vacant.

#### A. Material misrepresentations committed by an insured during the claim provide a sufficient basis for voiding an insurance policy.

Misrepresentation provisions providing the policy is void if an insured misrepresents a material fact concerning a claim, such as the one contained in Nephrite's policy, have been consistently enforced in Missouri and repeatedly upheld as a justification for voiding the entire policy and denying coverage for all claims being made when an insured commits a material

14

misrepresentation in the claim as to a portion of the loss. C*hilders v. State Farm Fire & Cas. Co*., 799 S.W.2d 138, 141 (Mo. Ct. App. 1990); SOF ¶177.

In *Scott*, the insured submitted a proof of loss to its insurer claiming a loss of $93,077.19 in personal property. *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 420 (8th Cir. 2007). However, just a year before, the insured filed a petition for bankruptcy declaring she owned only $7,340 in personal property. *Id*. The insured's policy stated that the insurer provided no coverage if the insured misrepresented or concealed any material fact or circumstance. *Id*. Accordingly, this Court found, and the Eighth Circuit affirmed, that the insured's misrepresentation as to her property in her proof of loss voided coverage under her policy. *Id*. at 423.

*See also Neidenbach v. Amica Mut. Ins. Co*., 96 F.Supp.3d 925 (E.D. Mo. 2015) (Summary judgment entered by this Court against the insureds and in favor of the insurer because the insureds misrepresented material facts and circumstances concerning the nature and extent of claimed losses and damages where they sought payments of $262,500 for personal property and $375,000 for the dwelling after claiming only $7,000 and $300,000, respectively, in bankruptcy); *Santizo v. Allstate Property & Cas. Ins*. Co., 2010 WL 2735649 (E.D. Mo. 2010) (Insurer's motion for summary judgment granted where insured violated concealment or misrepresentation provision by claiming $49,765.82 in contents one year after claiming only $2,810 in bankruptcy).

**B.    Nephrite represented that Apartment 4 was occupied and was not gutted until after the March 1, 2018 fire.**

Following the fire, Nephrite submitted a claim to CM Vantage.  SOF ¶72.  Although Nephrite failed to produce any estimates containing actual dollar figures during the claim, its public adjuster, Paul Abrams, did produce three separate scopes purporting to represent the

damages sustained to each of the 12 units of Building 9815 resulting from the fire, including Apartment 4, and Nephrite is seeking the damages contained therein. SOF ¶¶117-18. It was only after suit was filed that Nephrite submitted a damage estimate containing the alleged cost to repair the damages attributable to the fire. SOF ¶122. This estimate seeks damages of $82,574 for each of the individual units in Building 9815, including Apartment 4. SOF ¶123.

Additionally, in support of its claim for lost rents, Nephrite represented that Building 9815 was fully occupied, with tenants residing in each of the 12 apartments, including Apartment 4, at the time of the fire. SOF ¶¶126 & 128. In an effort to recover lost rents for Apartment 4, Nephrite expressly represented that it was not vacant and had been continuously occupied from August 1, 2016 until the day of the fire. SOF ¶127.

Following the fire, in support of their claims for property damages, as well as lost rents, Mr. Sheehy, Mr. Davila, and Mr. Abrams all represented to CM Vantage that Apartment 4 had not been gutted until after the fire. SOF ¶¶112-114. However, their misrepresentations have been exposed by the uncontroverted evidence and even by their own admissions, which are fatal to their claims for recovery.

### C.      Apartment 4 had been vacant since at least August 2016 and was gutted well before the March 1, 2018 fire.

Apartment 4 was conclusively documented to be vacant by the City of Raytown Building Inspector, William Andrew Boyd, during his inspections on August 1, 2016 and April 7, 2017, as well as on the date of the fire, March 1, 2018. SOF ¶¶92, 94-96. Not only was Apartment 4 vacant with no one living it, but the space was filled with miscellaneous debris because Nephrite was using the space to store extra supplies. SOF ¶95. The sheetrock with mold was removed by Nephrite by April 7, 2017, but from that time up until the fire, no other changes had been made:

on March 1, 2018, the apartment was vacant, the sheetrock had never been reinstalled and it was still full of debris. SOF ¶¶94, 96-98

The origin and cause investigator, Phillip Keena, as well as the Independent Adjuster, Ron Goddard from York, also confirmed that not only was Apartment 4 vacant and gutted to the studs with all sheetrock removed from the ceilings and walls, but also all kitchen cabinets, appliances and plumbing fixtures, as well as the furnace, had been removed prior to the fire. SOF ¶106.  The even smoke and soot deposits, as well as the lack of protected areas, confirmed that the sheetrock and these items had all been removed prior to the fire.  SOF ¶¶108-109.  In fact, the only protected areas were from trash cans that were present at the time of the fire.  SOF ¶110.  The presence of mold and fungus growth was also observed, including on the carpet and over the bottom plates of the studs, and this only could have developed after the sheetrock was removed, which was prior to the fire.  SOF ¶¶107 & 111.

In reviewing Mr. Boyd's photographs, Mr. Sheehy admitted that there was no drywall in Apartment 4 and attempted to explain that this was due to the mold remediation that occurred prior to the fire.  SOF ¶99.  Mr. Sheehy and his expert also admitted that an apartment could not be occupied or leased by Nephrite if there was no drywall and that Apartment 4 was not fixed up for occupancy or set for living arrangements at the time of the fire.  SOF ¶100.

Although Mr. Sheehy acknowledged that it would cost Nephrite between $17,000 and $35,000 to remediate the mold and place Apartment 4 in a livable condition, no permits were ever issued by the City of Raytown for this work.  SOF ¶¶102-03.  Additionally, despite Mr. Sheehy's attempts to claim that no final inspection for occupancy was required, Mr. Boyd confirmed that the City of Raytown does require such an inspection for occupancy, but that one had never been granted for Apartment 4.  SOF ¶¶104-05.

D.      **Conclusion**

Nephrite is claiming expenses associated with the mold damage in Apartment 4 that were present prior to March 1, 2018, as well as lost rents for this apartment, despite it being gutted and vacant at the time of the fire.   SOF ¶¶124-25.   Both of these constitute significant material misrepresentations in the claim with respect to items that Nephrite is seeking to be paid, which should void the policy and preclude coverage for any of the claimed losses.   SOF ¶177.

IV.     **Nephrite breached the Duties in The Event of Loss or Damage condition of the policy by failing to cooperate with CM Vantage's investigation of the claim.**

A.      **An insured's breach of the policy's cooperation clause precludes coverage for its claims.**

Under Missouri law, cooperation clauses, such as the one contained in Nephrite's policy, are enforceable and an insured forfeits coverage by failing to comply.   *Wiles v. Capitol Indem. Corp.*, 215 F.Supp.2d 1029, 1031 (E.D. Mo. 2001) (*citing Riffe v. Peeler*, 684 S.W.2d 539, 542 (Mo. Ct. App. 1984)); ¶177.   An insured's failure to cooperate can be determined as a matter of law at the summary judgment stage.   *Id*. at 1032; *Church Mutual Ins. Co. v. Pleasant Green Missionary Baptist Church*, 2016 WL 4396169, *4 (E.D. Mo. 2016).

The purpose of a cooperation clause is to "enable the [insurance] company to possess itself of all knowledge, and all information as to other sources of knowledge, in regard to facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims."   *Wiles*, 215 F.Supp.2d at 1031 (*quoting Wood v. Allstate Ins. Co*., 21 F.3d 741, 745 (7th Cir. 1994); *Claflin v. Commonwealth Ins. Co. of Boston, Mass*., 110 U.S. 81, 94-95 (1884)).   After establishing a material breach of the cooperation clause, the insurer is entitled to deny coverage to the insured under the terms of the policy as long as the insurer has not waived its right to assert the defense or is estopped from asserting it.   *Id*.   (*citing Hendrix v. Jones*, 580

18

S.W.2d 740, 742 (Mo. banc 1979)).  Furthermore, the insurer "must prove (1) the existence of substantial prejudice and (2) the exercise of reasonable diligence to secure the insured's cooperation before it can deny coverage because of breach of a cooperation clause."  *Id*. (*quoting Hayes v. United Fire & Casualty Co*., 3 S.W.3d 853, 857 (Mo. Ct. App. 1999)).

In *Wiles*, the plaintiff was found to have breached a cooperation clause as a matter of law that is virtually identical to the one in Nephrite's policy, which required cooperation, production of documents and records and appearance at an EUO.  *Wiles*, 215 F.Supp.2d at 1031: ¶177.  The defendant insurance company sent correspondence to the plaintiff scheduling the EUO for June 4, 1999, but the plaintiff failed to appear and testify.  *Id*. at 1030.  The plaintiff also disregarded a subsequent request for an EUO scheduled for June 25, 1999.  *Id*.  The insurer was found to have exercised reasonable diligence in attempting to secure the plaintiff's cooperation by twice requesting the EUO prior to the plaintiff's filing suit, but the plaintiff failed to comply with the requests.  *Id*. at 1031-32.  As a result, this Court found that the insurer demonstrated a material breach of the cooperation clause regarding the obligation to submit to an EUO as a matter of law. *Id*. at 1031.  *See also Union Ins. Co. of Providence v. Williams*, 261 F.Supp.2d 1150 (E.D. Mo. 2003) (Insurer that brought declaratory judgment action was prejudiced as a matter of law due to the insured's failure to appear for an EUO despite insurer's repeated requests to insured and her attorney).

**B.**      **Nephrite failed to cooperate with CM Vantage's investigation by failing to provide a proof of loss, failing to appear for an EUO and failing to produce requested documents and records.**

Following the fire, Nephrite submitted a claim to CM Vantage.  SOF ¶72.  Subsequently, numerous issues soon arose. The origin and cause investigator concluded that this was an incendiary fire, which was started with accelerants on a bed in Apartment 8 of Building 9815.

SOF ¶71.  Additionally, CM Vantage became aware of certain potential prior misrepresentations Nephrite had committed during the application process with respect to undisclosed prior losses and tenants receiving subsidized housing, discussed in more detail above.  As conceded by Nephrite's own expert, if the insurance company learns of information during the investigation and adjustment of the claim that it did not previously know, that is an appropriate time to request documents and take an EUO.  SOF ¶129.

This is exactly what CM Vantage attempted to do; however, it was met with a repeated and persistent lack of cooperation from the insured and its public adjuster, specifically involving not providing information needed to properly handle the claim.  SOF ¶130.  During the claim, CM Vantage needed certain essential information from Nephrite, as the insured is responsible for presenting its claim, including an estimate from its contractor or public adjuster, and the proof of loss, which is the presentation of the dollar amount being claimed.  SOF ¶119-20 & 162.  However, CM Vantage never received a proof of loss from Nephrite or an estimate from Nephrite's contractor or public adjuster for the cost of repairs containing an actual dollar amount.  SOF ¶¶121 & 168.

CM Vantage sent a reservation of rights letter on March 29, 2018 to Nephrite alerting it to issues involving concealment, misrepresentation and fraud that were being investigated by CM Vantage.  SOF ¶¶131-32.  As of March 29, 2018, CM Vantage was requesting that Nephrite provide a proof of loss and documentation and information supporting its claim within 60 days, as well as that it submit to an EUO.  SOF ¶¶133-34.  CM Vantage subsequently followed up in letters on July 17, 2018 and July 24, 2018, requesting that Mr. Sheehy appear for an EUO on August 6, 2018 and produce specific documents and records, including a proof of loss, at least five days prior to the EUO.  SOF ¶¶135-36.  Importantly, Nephrite's own expert acknowledges

20

that CM Vantage provided ample notice for the production of the proof of loss and other documents, as well as for the EUO, and agrees that the majority of documents and records requested by CM Vantage were reasonable and appropriate given the circumstances.  SOF ¶¶137-38.

On August 3, 2018, the Friday before the EUO, CM Vantage was contacted by an attorney advising that he represented Nephrite and he and Mr. Sheehy were unavailable for the previously scheduled EUO.  SOF ¶139.  In order to accommodate Nephrite and its counsel, CM Vantage agreed to postpone the EUO, but requested that the documents and records that had been previously requested in July be provided by August 15, 2018.  SOF ¶¶140-41.  After receiving no response or any documents or records for over 30 days, CM Vantage followed up with Nephrite's attorney on September 7, 2018, requesting that the requested information be provided within 10 days.  SOF ¶¶142-145.  CM Vantage also advised that if Nephrite failed to respond within that timeframe, then it would proceed with setting the EUO.  SOF ¶146. Nephrite and its attorney again failed to respond to CM Vantage in any manner or provide any of the requested documents or records; therefore, on September 21, 2018, CM Vantage requested that Mr. Sheehy submit to an EUO on October 10, 2018 and produce the requested documents and records, which had been sought since July, at least five days prior.  SOF ¶¶147-153.

Neither Mr. Sheehy, nor any other agent, representative or employee from Nephrite, appeared for the rescheduled EUO on October 10, 2018 and none of the requested documents and records were produced.  SOF ¶¶154, 156 & 159-60.  Yet again, Nephrite and its attorney failed to respond to CM Vantage's correspondence in any manner, whether by phone call, e-mail or otherwise, by October 10, 2018 and never requested that the EUO be cancelled, postponed or rescheduled.  SOF ¶¶157-58.  No response at all was received by Nephrite to CM Vantage's

August 3, 2018, September 7, 2018 or September 21, 2018 communications by October 10, 2018, the date of the EUO.  SOF ¶155.

CM Vantage requested a proof of loss in each of its letters sent to Nephrite requesting documents and an EUO.  SOF ¶161.  However, no proof of loss or estimate containing a dollar figure for Nephrite's damages was ever provided.  SOF ¶¶163, 168 & 177.  The only excuse offered by Mr. Sheehy is that he "overlooked" this request.  SOF ¶164.  However, such an excuse, in addition to not being legally exculpatory, is also not credible.  Mr. Sheehy was familiar with the proof loss process as he had previously submitted them on other claims.  SOF ¶165.  He also engaged and relied on the assistance of a public adjuster, Mr. Abrams, with whom he had previously worked on other claims, including a prior fire, and public adjusters know what a proof of loss is.  SOF ¶¶73-74 & 166-67.

In addition to documentation establishing the damages being claimed, Nephrite also refused to provide documentation establishing which of its tenants received subsidized housing.  After discovering the potential issue regarding tenants receiving housing subsidies that was not disclosed during the application process, CM Vantage requested documentation from Nephrite in order to verify whether the tenant in Apartment 8, where the fire occurred, or any other tenants, were receiving housing subsidies, but no such information was provided.   SOF ¶169-171.  Nephrite's own expert concedes that CM Vantage would have to receive such information from the insured pursuant to the policy.  SOF ¶172.  Nephrite also did not permit CM Vantage to examine its books and records.  SOF ¶173.

## C.    Conclusion

Nephrite breached the cooperation clause of the policy by failing to provide a proof of loss setting forth the amount of its claim, failing to provide requested documents and records and

failing to submit to an EUO.  Due to Nephrite's failures to cooperate, CM Vantage was unable to pay this claim and was forced to file suit.  SOF ¶¶175-76.

CM Vantage exercised reasonable diligence through its numerous requests for documents and information, as well as the EUO, from Nephrite and did not waive and expressly reserved its rights and defenses under the policy and Missouri law in the letters it sent to Nephrite.  SOF ¶174.  Additionally, CM Vantage was substantially prejudiced in its investigation because it was precluded from possessing all knowledge and information as to other sources of knowledge and facts material to its rights to enable it to decide upon its obligations and protect itself against false claims.  SOF ¶178.  Thus, due to Nephrite's breaches of the Duties In The Event Of Loss Or Damage condition of the policy, there is no coverage owed for any of Nephrite's claims. SOF ¶177.

## V. Nephrite's claims for declaratory judgment, breach of contract and vexatious refusal all fail as a matter of law.

In its First Amended Counterclaim, Nephrite asserts three claims against CM Vantage: declaratory judgment, breach of contract and vexatious refusal to pay.  *See* Doc. #19, Nephrite's First Amended Counterclaim.  However, none of its three claims can preclude entry of summary judgment in CM Vantage's favor on its Complaint and summary judgment should also be entered in CM Vantage's favor on Nephrite's counterclaims.

Nephrite's first two claims, for declaratory judgment and breach of contract, are duplicative of one another and assert virtually identical issues to those contained in CM Vantage's Complaint.  *See* Doc. #1, CM Vantage's Complaint for Declaratory Judgment.  Thus, as summary judgment should be entered in CM Vantage's favor on its Complaint, as set forth in the preceding sections, summary judgment should also be entered in CM Vantage's favor on Nephrite's claims for declaratory judgment and breach of contract for the same reasons that

Nephrite breached the policy through its material misrepresentations in the application and the claim, as well as its failures to cooperate with CM Vantage's investigation.

Additionally, summary judgment should also be entered in CM Vantage's favor on Nephrite's remaining claim for vexatious refusal to pay because such a claim is not viable in the absence of a breach of contract by the insurer. As set forth above, Nephrite's breach of contact claim fails as a matter of law; consequently, its vexatious refusal to pay claim necessarily fails as well.

A vexatious refusal to pay claim can only be sustained where an insurer refuses to pay a claim "without reasonable cause or excuse." Mo. Ann. Stat. §375.420. Under the vexatious refusal to pay statute, damages are only to be awarded "in addition to" damages awarded on a judgment, and are calculated based on that award. *Id.* As a vexatious refusal to pay claim is derivative of an insured's claim for its loss, it must fail where the insured's claim to recover for its loss fails. *State ex rel. U. S. Fid. & Guar. Co. v. Walsh*, 540 S.W.2d 137, 141 (Mo. Ct. App. 1976); Mo. Ann. Stat. §375.420. Thus, where the insured's breach of contract claim fails, the vexatious refusal to pay claim must also fail. *Grobe v. Vantage Credit Union*, 679 F.Supp.2d 1020, 1034 (E.D. Mo. 2010) ("[The insured's] breach of contract claim fails to state a claim upon which relief can be granted. It follows that [the insured's] claim for vexatious refusal to pay must also fail. There is no liability under the policy as a matter of law, and this is a meritorious defense for vexatious refusal to pay.") (*citing Groves v. State Farm Mutual Auto. Ins. Co.*, 540 S.W.2d 39, 42 (Mo. 1976)).

Obviously, an insurer cannot be "vexatious" for refusing to pay sums which it did not owe. *See Bd. of Educ. of City of St. Louis ex. rel Bertolino v. Vince Kelly Construction*, 963 S.W.2d 331, 335 (Mo. Ct. App. 1997) (Conclusion that an insurer was not required to pay an

insured "rebuts any contention that it did not have a meritorious defense for refusing to pay" and precludes a vexatious refusal to pay claim).  Therefore, where nothing is due under the policy, there can be no award for damages under the vexatious refusal to pay statute.  *See Walsh*, 540 S.W.2d at 141 (Where "no amount was due under the [policy]" there was no loss and "therefore nothing which vexatious damages and attorneys' fees can be made in 'addition to'").

For these reasons, summary judgment should also be entered in favor of CM Vantage on Nephrite's counterclaims for declaratory judgment, breach of contract and vexatious refusal.

### CONCLUSION

For all the reasons stated herein, as well as in CM Vantage's Motion for Summary Judgment and Statement of Uncontroverted Material Facts, summary judgment should be entered in CM Vantage's favor finding that: (1)Nephrite breached the policy through its material misrepresentations in the application process, its material misrepresentations in the claim and its failures to cooperate; (2) the policy is void; and (3) there is no coverage under the policy for Nephrite's claims.

Respectfully submitted,


/s/ Robert W. Cockerham
Robert W. Cockerham #31984
Ryan T. Knopf #63938
Cockerham & Associates, L.L.C.
10803 Olive Blvd.
St. Louis, MO 63141
314-621-3900
Fax:  314-621-3903
rcockerham@cockerhamlaw.com

Attorneys for Plaintiff CM Vantage
Specialty Insurance Company

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on October 11, 2019, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing service on all counsel of record.


         /s/ Robert W. Cockerham