**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| CM VANTAGE SPECIALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 4:18-cv-01749-JMB ) |
| NEPHRITE FUND I, LLC D/B/A AMBER GLEN APARTMENTS, | ) ) ) |
| Defendant. | ) |

**PLAINTIFF'S REPLY IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff CM Vantage Specialty Insurance Company ("CM Vantage"), by and through undersigned counsel, and for its Reply in Support of its Motion for Summary Judgment, states as follows:

**I.     CM Vantage did not waive its claims because it is not required to return the premium prior to Nephrite's policy being declared void by the District Court.**

Nephrite alleges that CM Vantage is not entitled to a portion of the requested relief it seeks, specifically limited to a declaration that the policy is void ab initio, because it has not returned Nephrite's premium.[1]  However, Nephrite misstates the law to this Court, as returning the premium is not required in Missouri.

In support of its contention, Nephrite seeks to rely upon a prior decision by this Court in *Starr Indemnity & Liability Co. v. Continental Cement Co*., L.L.C., 2013 WL 1442456 (E.D.

---

[1]  It is important to note that if this Court finds that Nephrite breached the Duties In The Event Of Loss Or Damage Condition of the policy, then there would be no coverage for Nephrite's claims pursuant to Missouri law, but this would not result in Nephrite's policy being void, as only a breach of the Concealment, Misrepresentation Or Fraud Condition results in the policy being void.  Exhibit 11, pgs. 13-14 & 65.  Thus, under such a determination that Nephrite failed to cooperate, but did not commit a material misrepresentation, Nephrite would not be entitled to repayment or a credit for any premium it paid.  Thus, at best, Nephrite's argument only pertains to the material misrepresentations it committed, not to its failures to cooperate.

Mo. 2013).  This Court held that the insurer did not waive its argument that the policies were void due to misrepresentations in the application because it retained the premium of $50,000.  *Id.* at *15.  Nephrite cites an incomplete and misleading portion of the Court's opinion suggesting that this was only because the insurer was "ready, willing and able to return the premiums upon a favorable determination from this Court."  *Id.*; Doc. #41, pg. 3.  However, in the very next sentence, which Nephrite failed to cite, this Court held "Missouri precedent does not require returning the premiums prior to maintaining a suit for declaratory judgment."  *Id.*  In reaching its decision, this Court also relied upon *Reliable*, which held:

> In the absence of a statute, an insurance company is not required to return or tender back the premiums received as a condition precedent to bringing a suit in equity to cancel a policy on the ground of fraud, though the court may require such tender as a condition to the entry of its decree.  Nor is a deposit in court of the premiums paid a condition precedent to maintaining the suit.  See 12 C.J. S., Cancellation of Instruments, §43, pg. 1003, which announces the rule, as follows: 'Whatever may be the rule at law on the subject, it is not essential to deposit in court the thing or the amount necessary to place defendant in stau quo, since the court is authorized under the prayer for general relief to dispose of the whole case on equitable terms, whether the amount is deposited in court or not.'

*Reliable Life Ins. Co. v. Bell*, 246 S.W.2d 371, 375-76 (Mo. Ct. App. 1952).

Despite Nephrite's claims to the contrary, CM Vantage is not required to return the premium to Nephrite under Missouri law in order to proceed on its claim for declaratory judgment.  Nephrite alternatively argues that CM Vantage must offer to return the premium.

Although CM Vantage is not required under *Starr* and *Reliable* to offer to return the premium, in its Wherefore Clause, CM Vantage broadly requested that the Court grant "any and all such further relief that this Court deems just and proper under the circumstances."  Doc. #1, pg. 8.  This prayer for general relief includes any adjustment of the equities, specifically with respect to potentially having to refund the premium if the District Court determines the policy is void ab initio.

2

Even if this Court would determine that it is necessary for CM Vantage to offer to return the premium and that the general request for relief is insufficient, this would not impact CM Vantage's claims.  Any omission is not fatal because in an equitable action, "the court has the inherent power to adjust equity between the parties."  *Osterberger v. Hites Const. Co*., 599 S.W.2d 221, 230 (Mo. Ct. App. 1980).  Thus, this Court still has the inherent power to do equity amongst the parties, which would include addressing any premium potentially owed to Nephrite.

Further, in situations where an insurer pays money to an insured under a policy that is subsequently rescinded by reason of the insured's material misrepresentation, "the insurer has a right of offset, and return of the premium is not a condition precedent to rescission."  *Gutting v. Shelter Mut. Ins. Co*., 905 S.W.2d 550, 553 (Mo. Ct. App. 1995).  In the present matter, although CM Vantage was fortunate to discover Nephrite's material misrepresentations before it issued any advance payments, it is still seeking to recover its costs, expenses and attorneys' fees.  Doc. #1, pg. 8.  If CM Vantage prevails on its claims that Nephrite committed material misrepresentations, then it would be entitled to recovery of these sums from Nephrite.  28 U.S.C. §2202; *Employers Mut. Cas. Co. v. Tavernaro*, 21 F.Supp.2d 1039, 1040 (E.D. Mo. 1998); *Wiles v. Capitol Indem. Corp*., 204 F.Supp.2d 1207, 1208 (E.D. Mo. 2002).  At such a time, a set off would be applied, with the amount of the premium being subtracted from the sums Nephrite owed CM Vantage for its costs, expenses and attorneys' fees.

For these reasons, Nephrite's argument concerning returning the premium fails.

## II.    Nephrite made material misrepresentations during the application process.

### A.    Nephrite misrepresented the presence of tenants receiving subsidized housing.

Nephrite alleges that it did not make any misrepresentations during the application process about subsidized housing; however, on the AmRisc Application / Schedule of Values

("AmRisc Application"), Nephrite expressly represented that each building at the subject property contained 0% subsidized housing.[2]  Exhibit 1, pg. 65 & 112; Exhibit 2, pg. 73; Exhibit 3, pg. 56; Exhibit 4, pgs. 20 & 21; Exhibit 6, pg. 79; Exhibit 7, pg. 2.

Recognizing the devastating impact the AmRisc Application has on its claims, Nephrite attempts to concoct a procedural argument suggesting that there is no admissible evidence that Nephrite and its broker completed and submitted the document as part of the application process. As an initial matter, Nephrite fails to present any evidence to this Court even suggesting that the AmRisc Application was not completed by Nephrite and its broker, Lonnie Kitchen, but rather only engages in conjecture and therefore did not controvert this material fact.  If there were any truth to Nephrite's allegation, then it would have submitted an affidavit from Mr. Sheehy and Mr. Kitchen setting forth under oath that the AmRisc Application was not completed and submitted by Nephrite during the application process.  This is particularly true given that Nephrite did submit an Affidavit from Mr. Sheehy, but his Affidavit makes no reference to the AmRisc Application.  Exhibit Z.

The undisputed evidence CM Vantage submitted with its initial filing conclusively establishes that Nephrite and its broker completed and submitted the AmRisc Application in order to obtain insurance with CM Vantage.  However, in response to this new argument being presented by Nephrite concerning admissibility, CM Vantage is submitting the Affidavit of

---

[2]  Despite its attempts to discredit the AmRisc Application and the representations contained therein concerning there being no subsidized housing at the subject property, Nephrite admits that Alan Sheehy, its corporate representative, signed the Habitational Supplemental Questionnaire as part of the application process, which also represented that there were no HUD or other subsidized housing at the subject property.  Doc. #42, SOF 24-27. Nephrite alleges however, that the false information contained therein is not relevant because this form was not submitted to CM Vantage during the application process.  Nephrite's argument with respect to this document can basically be summed as "Yes, we made material misrepresentations on this form, but they were only made to other potential carriers, not CM Vantage."  While it may be true that the Habitational Supplemental Questionnaire was not provided to CM Vantage, the document establishes a pattern and practice of Nephrite falsely representing that there was no subsidized housing at the subject property while attempting to obtain insurance coverage.

Kevin Ware to further support this conclusion and further refute the rank speculation being peddled by Nephrite concerning the AmRisc Application.  *See* Exhibit 41, Affidavit of Kevin Ware.  Mr. Ware confirms that: (1) the AmRisc Application, which represents that there were no tenants receiving subsidized housing at any of the buildings at Amber Glen Apartments, was completed and filled out by Nephrite and Mr. Kitchen; (2) Mr. Kitchen provided the AmRisc Application to Mr. Ware; and (3) neither Mr. Ware, nor anyone else at RT Specialty, prepared or completed the AmRisc Application or made any changes or modifications before it was sent to CM Vantage.  Exhibit 41, pgs. 1-2, 4 & 7.

Nephrite's attempts to distance themselves from its broker, Mr. Kitchen, are likewise unavailing and contrary to well-established Missouri law.  Nephrite unequivocally admits that it used a broker, Mr. Kitchen at Franklin Street Insurance, who acted on Nephrite's behalf and not for the insurance company; that Mr. Kitchen was able to acquire insurance from different insurers as he was not a captive agent; and that Mr. Kitchen was attempting to obtain the best deal, the best premium and the best product for Nephrite.  Doc. #42, SOF 10-13.  When a broker, such as Mr. Kitchen, acts on behalf of an insured, such as Nephrite, to shop around for insurance among multiple insurance companies, they are the agent of the insured.  *Mark Andy, Inc. v. Hartford Fire Ins. Co*., 229 F.3d 710, 717 (8th Cir. 2000).  "Any mistakes made by the broker are attributable to its principal, the insured, and not to the insurance company."  *Id*.  Thus, Nephrite is bound by the information contained on the AmRisc Application, regardless of Mr. Sheehy's purported lack of recollection during his deposition.  Exhibit 1, pgs. 97-98 & 112-13.

Further, the cases relied upon by Nephrite all involve situations where erroneous information or a mistake is contained on an application.  However, in the present matter no such erroneous information or mistake exists.  Not only does not Nephrite fail to allege that the

information concerning there being no subsidized housing on the AmRisc Application is incorrect, because it cannot do so, but also Nephrite expressly confirms that this information stating "0%" subsidized" came from Mr. Sheehy telling Mr. Kitchen that there were no HUD or other subsidized units at the subject property.  Doc. #42, SOF 29.  This information is undeniably false as Nephrite and its own expert, Donald Roinestad, admit that multiple tenants received subsidies to pay their monthly rent, including HUD and Section 8 subsidies from the Housing Authority of Kansas City, but these were not disclosed to CM Vantage during the application process.  Doc. #42, SOF 79, 82, 84-85 & 87.

**B.      The presence of tenants receiving subsidized housing is material.**

In a futile attempt to minimize the impact of its misrepresentations concerning subsidized housing, Nephrite claims that they are not material.  However, its argument is contrary to the facts, including the testimony of its own expert, as well as Missouri law.

The standard for materiality for a misrepresentation in an insurance application is "whether the fact, if stated truthfully, might reasonably influence an insurance company to accept or reject a risk or to charge a different premium."  *See Haynes v. Missouri Prop. Ins. Placement Facility*, 641 S.W.2d 497, 499 (Mo. Ct. App. 1982).  Mr. Roinestad admits that the presence of subsidized housing is something the insurance company would want to know about because it is material to underwriting the risk pursuant to the standard in the industry with respect to this type of market.  Exhibit 6, pg. 79.  The presence of tenants receiving subsidized housing is information that is material in the insurance industry in general, and specifically to CM Vantage, in the underwriting of a policy.  Exhibit 3, pgs. 70-71; Exhibit 4, pgs. 31 & 33.

Thomas Dassow, Senior Underwriter at CM Vantage, testified as the company's corporate representative concerning the underwriting practices at the time the Nephrite policy

6

was issued: CM Vantage starts with a higher base rate, .30 instead of .25, that would have increased the premium being charged by 20% if there was only one tenant receiving subsidized housing.  Exhibit 3, pgs. 6-7, 60-61 & 66.  Mr. Roinestad confirmed that if a property has tenants with subsidized housing, an insurance company has the right to decide not to write the risk or to charge a different premium.  Exhibit 6, pgs. 79, 108, 141 & 160-61.

Nephrite seeks to fault CM Vantage for not having written underwriting guidelines specifying subsidized housing results in a higher premium or a policy not being written.  However, this argument is refuted by Mr. Roinestad, who confirmed that a non-admitted insurance carrier, such as CM Vantage, is not required to have written underwriting guidelines pursuant to the insurance rules and regulations.  Exhibit 40, pgs. 20-21.[3]

Contrary to Nephrite's suggestions, there is no "CM Vantage" application.  Rather, the applications, including the unsigned Accord Application and AmRisc Application, the latter of which specifically asks about subsidized housing, were completed by Nephrite and its broker, Mr. Kitchen, and then submitted to CM Vantage.  Exhibit 41.  Further, despite Nephrite's attempts to vaguely suggest that there was some confusion from Nephrite concerning what constituted subsidized housing that would need to be disclosed, both Nephrite's corporate representative, Mr. Sheehy, and its expert, Mr. Roinestad, both acknowledge that HUD or Section 8 housing constitutes subsidized housing.  Exhibit 1, pgs. 75, 185 & 211-12; Exhibit 6, pgs. 142, 147 & 150; Doc. #42, SOF 32.  However, Nephrite admits this information was not disclosed to CM Vantage.  Doc. #42, SOF 34.

---

[3]  The *Practorian Ins. Co.* case relied upon by Nephrite is distinguishable, as in that matter the insurance company sought to allege that various deficiencies in a fire protection system were material even though the specific items were not included on the application or in a subsequent inspection report.  *Practorian Ins. Co. v. Site Inspections, LLC*, 2008 WL 11338464, (W.D. Mo. 2008).  By contrast, in the present matter, the AmRisc Application expressly requested information concerning tenants receiving subsidized housing, which information was misrepresented, as discussed in more detail in the proceeding section.

CM Vantage's practice of increasing the premium for properties containing tenants with subsidized housing, thereby further establishing the materiality of such information, is consistent not only with the custom in the insurance industry, but also Missouri law.  Further, contrary to Nephrite's suggestion, there was no reason for CM Vantage to follow up with Nephrite concerning subsidized housing because Nephrite had already expressly represented that there were no tenants receiving subsidized housing.  *See Weekly v. Missouri Property Ins. Placement Facility*, 538 S.W.2d 375, 379 (Mo. Ct. App. 1976) ("Where the answers in the application are complete on their face, the insurer is not obliged to make further inquiry, and absent knowledge of the true facts is not estopped to avoid the policy.").

## C.      Nephrite misrepresented that there were no prior losses.

As set forth in CM Vantage's prior summary judgment filings, the evidence conclusively establishes that Nephrite failed to disclose the prior mold loss in Apartment 4 of Building 9815 that had not been fully repaired when the insurance with CM Vantage was obtained.  Nephrite attempts to cast doubt on these undisputed facts, but its efforts are unsuccessful.

Nephrite seeks to claim that because mold is not a covered loss under the CM Vantage policy that it could not give rise to a claim and therefore did not need to be disclosed.  However, Nephrite's argument is misguided, as the Accord Applications make no mention of coverage, but instead seek information for "ALL CLAIMS OR LOSSES (REGARDLESS OF FAULT AND WHETHER OR NOT INSURED) OR OCCURRENCES THAT MAY GIVE RISE TO CLAIMS".  Exhibit 1, pgs. 76-79; Exhibit 2, pgs. 93-94; Exhibit 3, pgs. 41-44 & 46-44; Exhibit 4, pg. 13; Exhibit 6, pg. 85; Exhibit 9, pg. 3; Exhibit 12, pg. 4.  A "claim" and a "loss" are not synonymous, as an insured could sustain a loss causing damage, but elect not to file a claim with its insurer; thus, the mold damage should have been disclosed to CM Vantage.  Exhibit 4, pg. 13.

Ignoring the testimony of its corporate representative, Nephrite suggests that the mold in Apartment 4 was not the result of a water loss.  However, in response to a question asking whether there was water damage that then led to mold damage, Mr. Sheehy responded: "Well, there has to be water to provide substance for the mold to grow, so that would be correct." Exhibit 1, pg. 51.  The City of Raytown Building Inspector, William Andrew Boyd, also confirmed that the initial complaint in 2016, which led him to inspect Apartment 4, involved a water leak, and based on his 30 years of experience he concluded that the mold he witnessed was the result of a water leak.  Exhibit 19, pgs. 24 & 34-35.  Mr. Roinestad agrees that a water loss is something that may give rise to a claim and should be reported on the application or in the procurement of insurance.  Exhibit 6, pg. 98-99.

Nephrite also seeks to distract this Court from its misrepresentation concerning prior losses by claiming that the signed Accord Application contains an ambiguity because the line is left blank for the number of years for which information is being requested.  Exhibit 12, pg. 4. However, this argument is nonsensical because Nephrite does not allege that it was confused concerning how much of its loss history needed to be disclosed.  Nephrite also does not claim that if a specified number of years had been listed on the document, then it would have truthfully disclosed the mold loss.  Rather, Nephrite's position, albeit incorrect, is that it was under absolutely no obligation to disclose the prior mold loss in Apartment 4.  This is confirmed by the fact that on the signed Accord Application, Nephrite marked the box next to "LOSS HISTORY" with an "X" stating "Check if none" thus representing that there were no prior losses. [4]  Exhibit 1, pg. 78; Exhibit 2, pgs. 93-94; Exhibit 4, pg. 13; Exhibit 12, pg. 4.  Thus, whether the number of years was blank or not is irrelevant and had no impact on Nephrite's misrepresentation.

---

[4] Further, on the unsigned Commercial Insurance Application, Nephrite represented that there were no prior claims or losses in the prior five years by leaving the Loss History section blank.  Exhibit 3, pgs. 41-42; Exhibit 6, pg. 85; Exhibit 9, pg. 3.

Nephrite also seeks to fault CM Vantage for its failure to include the number of years on the signed Accord Application, but its argument is misguided.  The document is not a CM Vantage application, CM Vantage does not provide anything to a potential applicant and the Application was completed by Nephrite and its independent insurance broker, Mr. Kitchen, with Mr. Sheehy providing information about the property to Mr. Kitchen.  Exhibit 1, pgs. 60-61, 63-64 & 76-78; Exhibit 3, pg. 43 & 46-47; Exhibit 5, pg. 92; Exhibit 41.

Relying on the Certificate of Inspection from Mr. Boyd, Nephrite also claims that the mold damage did not need to be disclosed because it was just a maintenance issue.  Exhibit 21, pg. 1.  However, there is no box on the Certificate of Inspection for "Insurance" or "Insurance Claim", as insurance and the potential existence of coverage are not relevant to Mr. Boyd's inspection.  This is further confirmed by the fact that the Certificate of Inspection following the fire on March 1, 2018, designates the Inspection Type as "Fire"; however, despite this designation, Nephrite still submitted the present insurance claim to CM Vantage.  Exhibit 26, pg. 6; Exhibit 1, pgs. 48 & 140; Exhibit 2, pg. 21.  Thus, how Mr. Boyd as the Building Inspector classifies his inspections does not have any bearing on whether an insurance claim could or should be submitted, whether coverage exists or whether the damage being noted by the inspection needs to be disclosed during the application process.

Contrary to the well-established evidence, Nephrite also seeks to maintain that the mold in Apartment 4 had been corrected prior to completion and submission of the application materials, which is why it did not disclose any uncorrected fire or safety code violations.  In support of this contention, it relies on Mr. Boyd's April 7, 2017 Certificate of Inspection.  Exhibit 21, pg. 2.  However, Mr. Boyd clarified in his March 28, 2018 e-mail, as well as in his deposition, that only the sheetrock with mold was gone.  Exhibit 19, pgs. 25-26, 33-34 & 37;

Exhibit 20; Exhibit 21, pg. 2.  Further, from April 2017 through the time of the fire, Apartment 4 was a vacant apartment with all sheetrock removed that was full of debris, as Nephrite was using it to store extra supplies.  Exhibit 4, pgs. 15 & 36; Exhibit 19, pgs. 25-26 & 41-42; Exhibit 20; Exhibit 21, pgs. 3-6.  Thus, Nephrite also misrepresented the ongoing presence of uncorrected safety code violations on the signed Commercial Insurance Application.  Exhibit 12, pg. 3.

> **D.    The existence of prior losses, specifically involving mold, are material.**

In an effort to lessen the impact of its misrepresentations, Nephrite alleges that they are not material.  However, Nephrite's position is contrary to the evidence, including its own expert.

Mr. Dassow, Senior Underwriter at CM Vantage, testified as CM Vantage's corporate representative concerning the impact of prior losses, specifically mold: it is not uncommon for CM Vantage to reject risks where prior mold is disclosed because mold is a serious issue that extends beyond property to liability and life safety issues and CM Vantage would not accept a risk where there was prior mold in the walls and flooring even if the walls had been replaced, because the mold would still be present in the studs and could come back.[5]  Exhibit 3, pg. 81-83. Mr. Dassow unequivocally testified that had CM Vantage been made aware of the prior mold problem in Apartment 4 of Building 9815 it would have declined to insure the risk.  Exhibit 3, pgs. 76-77 & 79.  Mr. Dassow's testimony is again confirmed by Mr. Roinestad, who admits that loss information should be disclosed during the application process, because it is pertinent and material to the insurance company, who would want to have this information to make a determination concerning whether to write the risk.  Exhibit 6, pgs. 80 & 98-99.

---

[5]  It should be noted that once again Nephrite seeks to fault CM Vantage based on its underwriting guidelines. However, Mr. Roinestad, admitted that CM Vantage, as a non-admitted insurance carrier, is not required to have written underwriting guidelines pursuant to the insurance rules and regulations. Exhibit 40, pgs. 20-21.

No information requested in the underwriting process is more material to the insurer than the cause, the number and the dollar amount of the insured's prior losses and claims, as well as the measures the insured has taken to correct, repair or remediate the property that had been damaged.  Exhibit 4, pg. 19.  The presence of mold is a crucial material fact in the underwriting of a habitational building and a mold loss resulting in $30,000-$35,000 in damages is a significant loss that needs to be reported.  Exhibit 2, pgs. 128 & 130; Exhibit 4, pg. 6.  However, Nephrite admits Mr. Sheehy never told his agent that Apartment 4 ever had water or mold damage, despite acknowledging the importance of loss information.  Doc. #42, SOF 59 & 61.

Nephrite seeks to fault CM Vantage for failing to follow up concerning the loss runs. However, Nephrite does not allege, as it cannot do so, that the loss runs would have resulted in the prior mold damage being disclosed to CM Vantage.  The loss runs were irrelevant and would not have revealed any information because Nephrite had not submitted any claims prior to March 1, 2018 and likewise represented that there were no prior claims on its applications.  Exhibit 1, pg. 48; Exhibit 9, pg. 3; Exhibit 12, pg. 4.  Thus, there was no reason for CM Vantage to request the loss runs due to Nephrite's representations that there were no prior losses and even if CM Vantage had received the loss runs, they would not have contained any new information because Nephrite had not previously submitted an insurance claim.

Nephrite also alleges that there was no risk to CM Vantage in issuing the policy because it would not have been responsible for providing coverage for mold damage.  Apparently, the irony of such an argument is lost on Nephrite.  As discussed in more detail below, Nephrite actually did submit a claim to CM Vantage seeking to have CM Vantage pay for the exact same mold damage that predated the policy. Exhibit 1, pgs. 153-62; Exhibit 4, pg. 35; Exhibit 5, pgs. 169-170, 172 & 189-90; Exhibit 27; Exhibit 28; Exhibit 29; Exhibit 30.

E.       Conclusion

The undisputed evidence conclusively establishes that Nephrite failed to disclose the presence of tenants receiving subsidized housing, as well as the prior mold loss.  This information is material in the insurance industry generally, as well as specifically to CM Vantage.  Contrary to Nephrite's suggestion, there is no dispute between the experts, because as set forth above, Nephrite's own experts admit all pertinent facts establishing the material misrepresentations.  Thus, summary judgment should be granted in CM Vantage's favor.

III.    **Nephrite also made material misrepresentations during the claim.**

From the outset of its claim, and throughout the entire litigation, Nephrite has steadfastly maintained that Apartment 4 in Building 9815 was not vacant and had been occupied at the time of the March 1, 2018 fire in order to support its claim for property damages and lost rents. Exhibit 1, pgs. 153-62, 170, 172-73 & 188-91; Exhibit 2, pgs. 71-72, 105 & 109; Exhibit 4, pgs. 35-36; Exhibit 13, pg. 11; Exhibit 22, pg. 3; Exhibit 24, pg. 2; Exhibit 25, pgs. 2-3; Exhibit 27; Exhibit 28; Exhibit 29; Exhibit 30, pgs. 5-6; Exhibit 31.  Only after CM Vantage established beyond any reasonable doubt in its summary judgment filings that Apartment 4 had not been repaired and was not occupied, is Nephrite attempting to withdraw its claim for these damages.

Through its purported withdrawal, Nephrite has conclusively admitted it made misrepresentations with respect to its claim for damages to Apartment 4, both for property damages and lost rents.  Nephrite now seeks to obtain absolution by attempting to withdraw these claims after it has been caught in the misrepresentation.  However, Nephrite ignores the fact that the misrepresentations already occurred during the claim before the litigation was filed. Moreover, Nephrite continued to pursue its claims for such damages throughout the litigation, both during Mr. Sheehy's corporate representative deposition, as well as through its submission

of a subsequent damages estimate seeking $82,574 for Apartment 4.  Exhibit 1, pgs. 153-62, 170, 172-73 & 188-91; Exhibit 30.

Nephrite fails to cite any case, and CM Vantage is unaware of any, that permits an insured to commit a material misrepresentation during the claim, continue to pursue the mispresented claim for damages throughout the litigation and only withdraw the claim in a response to the opposing party's motion for summary judgment in order to defeat a claim that it committed a misrepresentation.  In addition to being unsupported legally, permitting such conduct by an insured would establish poor precedent, as it would encourage insureds to submit misrepresented claims, force insurers to file suit and litigate through the summary judgment stage, before ultimately admitting that they committed a misrepresentation, but claiming no harm because once the misrepresentation was established, the claim was withdrawn.

It is also irrelevant that Nephrite ultimately withdrew the claim before any payments were issued.  Despite not issuing any indemnity payments, CM Vantage still sustained substantial harm through the costs, expenses and attorneys' fees it was forced to incur responding to Nephrite's misrepresented claim and establishing the misrepresentation before the Court.  Additionally, had CM Vantage issued payment during the claim for these misrepresented damages, as Nephrite's experts suggest should have occurred, CM Vantage would have sustained even more damages.  Nephrite fails to address this consequence of its conduct in its filings.

Contrary to Nephrite's claims, CM Vantage is not required to prove an intent to deceive with respect to the misrepresentations in the claim.  "According to Missouri law, despite the reference to the term, "fraud" in most misrepresentation clauses, the insurer is not required to prove the elements of fraud to avoid coverage if the policy language also indicates, as here, that the policy is rendered void for intentional concealment or misrepresentation of a material fact."

14

*Neidenbach v. Amica Mut. Ins. Co.*, 96 F.Supp.3d 925, 930 (E.D. Mo. 2015) (*citing Tavernaro*, 4 F.Supp.2d at 870).  Thus, an insurer is able to avoid liability under a policy by establishing the insured's material misrepresentation or concealment.  *Id.*

The *Young* case, relied upon by Nephrite, is distinguishable because in that matter the insureds requested that items be removed from the personal property inventory during the claims process because mistakes were made.  *Young v. Allstate Ins. Co.*, 685 F.3d 782, 783-84 (8th Cir. 2012).  In the present matter, not only is there no credible evidence of a mistake, but Nephrite maintained its misrepresented claim throughout the claim process and for over a year after suit was filed before attempting to withdraw it only after it had been proven by CM Vantage.

Nephrite's policy with CM Vantage provides that it is void if the insured, at any time, intentionally conceals or misrepresents a material fact concerning a claim.  Exhibit 11, pg. 65.  The undisputed evidence establishes that Nephrite intentionally misrepresented to CM Vantage that Apartment 4 was habitable and occupied in an effort to recover for property damages and lost rents for Apartment 4.  Exhibit 1, pgs. 153-62, 170, 172-73 & 188-91; Exhibit 2, pgs. 71-72, 105 & 109; Exhibit 4, pgs. 35-36; Exhibit 13, pg. 11; Exhibit 22, pg. 3; Exhibit 24, pg. 2; Exhibit 25, pgs. 2-3; Exhibit 27; Exhibit 28; Exhibit 29; Exhibit 30, pgs. 5-6; Exhibit 31.

In an effort to avoid the consequences of its misrepresentations, Nephrite seeks to allege that this portion of the claim was the result of a mistake. However, not only is such a claim unconvincing given the serious delay, it is also contrary to the well-established evidence. [6]

Only after it has been caught pursuing a misrepresented claim for over a year and a half, is Nephrite attempting for the first time to withdraw its claim for damages for Apartment 4.

---

[6]  Additionally, pursuant to the Federal Rules of Civil Procedure, Nephrite was required to raise with particularity the issue of mistake as an affirmative defense in its Answer.  Fed. R. Civ. P. 8(c); Fed. R. Civ. P. 9(b).  It failed to do so.  *See* Doc. 11, Nephrite's Answer.  Therefore, Nephrite waived the right to assert mistake as a defense to CM Vantage's claim of material misrepresentation.  *Landmark Bank of St. Charles County v. Saettele*, 784 F.Supp. 1434, 1440 (E.D. Mo. 1992).

Nephrite alleges it believed based on a review of its records and rent rolls, that Apartment 4 was habitable and occupied, but only learned through discovery it was not.  Nephrite fails, however, to set forth when exactly in discovery it learned Apartment 4 was uninhabitable and unoccupied, and does not offer a justification for its failure to withdraw its misrepresented claim at that time.

In support of its suggestion that its submission of a misrepresented claim was a mistake, Nephrite claims that Mr. Sheehy relied on the rent rolls and is not personally familiar with the all of the apartments in the complex, never saw the mold damage or the attempted repairs, and does not have detailed logs documenting the repairs.  However, such claims are unconvincing given Nephrite's continued insistence that it was entitled to damages for Apartment 4 throughout the litigation, which supports a finding that Nephrite's acts rise to the level of intentional conduct.

Mr. Sheehy was presented as the corporate representative on behalf of Nephrite and included on the list of topics for the corporate representative deposition were the following: all facts surrounding the fire and resulting damages to Nephrite's property and business; all facts surrounding the insurance claim submitted as a result of the fire; and, all facts supporting the claimed damages to Nephrite's property and business.  Exhibit 1, pgs. 6-7; Exhibit 42, pg. 4.  If there was someone more knowledgeable on these topics, specifically with respect to Apartment 4, then he or she should have been produced by Nephrite instead of Mr. Sheehy.  Nephrite cannot claim ignorance on such crucial matters in a desperate attempt to avoid summary judgment.

 Further, Nephrite fails to offer any justification for why Mr. Sheehy failed to contact someone with actual knowledge that worked at subject property in order to determine the condition and habitability of Apartment 4 at the time of the fire.  The damages being claimed for Apartment 4 have been at issue since the outset of the claim in March 2018, but despite the fact the fire occurred over 18 months ago and the litigation has been going on for over a year,

Nephrite is representing to this Court that it only just discovered this information, which is demonstrably false.  Nephrite, as the insured and owner of the property, is certainly the party in the best position to possess knowledge of the condition and occupancy of the units at its property.  If Mr. Sheehy was ignorant of such essential facts, then he either should not have been designated as the corporate representative or should have investigated this matter by speaking with someone with actual knowledge, such as the General Manager, Jesse Davila.

Moreover, a closer look at the statements made by Mr. Sheehy establishes that this was not just some simple mistake, oversight or misunderstanding, but rather an intentional, concerted and ongoing effort to recover sums from CM Vantage that are not owed under the policy.  When the condition of Apartment 4 came up at the beginning of the claim, Mr. Sheehy was indignant and adamantly defended this portion of Nephrite's claim:

> The unit was directly below the fire unit and was completely saturated with water.  It was not gutted prior to the fire.  I can gather witnesses as well as the contractors to attest that they gutted the unit post fire because of the fear of mold.  I also took a photo of the completely filled roll off on Sunday with was 2 days after the fire as further evidence.  Finally, the debris sitting outside on the concrete patio was still piled with debris that did not fit in the dumpster.  It is outrageous that they are claiming that there was no damage.  The carpet that remained in the unit was literally dripping wet with water when the adjusters did their inspection.  Did the water miraculously avoid all of the drywall and ceilings when the firemen were dousing the units upstairs in a torrent of water?  Of all the units affected, the unit below was the 2nd most damaged.
>
> Should I start contacting other tenants as witnesses that they saw the cleanout work initiated post fire?  It was an all day process so I am sure that I will have plenty of witnesses available to attest to the fact that the demo occurred AFTER the fire.

Exhibit 25, pgs. 2-3; Doc. #42, SOF 114.

Contrary to Nephrite's present claims, these are not the statements of someone who was simply mistaken concerning the condition of Apartment 4.  Rather, this is an e-mail from Nephrite's corporate representative persistently claiming that Apartment 4 was gutted after the

fire and threatening that he had extensive witnesses, both tenants and contractors, to establish this fact.  However, not only has Nephrite failed to present any such evidence to this Court, it has now completely reversed course and sought to withdraw all of its claims for these damages now that its misrepresentation has been proven and admitted.

Further, Nephrite's attempts to claim mistake based on Mr. Sheehy's ignorance are undermined and contradicted by its own judicial admission that Mr. Davila, General Manager at the subject property, also represented that all items and sheetrock had been removed from Apartment 4 after the fire.  Doc. #42, SOF 112.  Mr. Davila's conduct, coupled with that of Mr. Sheehy, establishes a willful and calculated pattern of intentionally misrepresenting the condition of Apartment 4 to CM Vantage in order to increase the amount of the claim.

The only conclusion to be reached is that Nephrite submitted a materially misrepresented claim seeking property damages and lost rents for Apartment 4, despite its uninhabitable and unoccupied condition at the time of the fire.  Due to the lack of any credible evidence of a mistake, this Court should find that Nephrite intentionally concealed or misrepresented material facts concerning the condition of Apartment 4 in order to recover property damages and lost rents.  Due to this, summary judgment should be entered in CM Vantage's favor.

**IV.** **Nephrite repeatedly breached the policy's cooperation condition.**

    **A.** **Nephrite failed to provide a proof of loss.**

In an effort to avoid the damaging impact of failing to provide a proof of loss, Nephrite alleges that CM Vantage is precluded from asserting this argument because it did not provide blank proof of loss forms to Nephrite.  However, Nephrite's argument is contrary to the facts.

CM Vantage requested that Nephrite provide a proof of loss in its reservation of rights letter, as well as in each subsequent letter it sent requesting documents and an Examination

Under Oath ("EUO").  Exhibit 5, pg. 110; Exhibit 32; Exhibit 33; Exhibit 34; Exhibit 35; Exhibit 36; Exhibit 37.   While CM Vantage may have inadvertently omitted the blank proof of loss forms when it sent the reservation of rights letter, Nephrite admits Mr. Sheehy was familiar with the proof of loss process, as he had previously submitted them on other claims, and was relying on his public adjuster during the claim process, including with respect to the proof of loss, and public adjusters know what a proof of loss is.  Exhibit 1, pgs. 203-07; Exhibit 5, pgs. 110, 203 & 205; Doc. #42, SOF 165-167.  If Nephrite truly intended to submit a proof of loss as required and pursuant to CM Vantage's request, once it recognized that it did not have blank proof of loss forms, it should have contracted CM Vantage to request such forms.  However, Mr. Sheehy never contacted CM Vantage to have them provide a blank proof of loss form and also never asked anyone to request a proof of loss form on Nephrite's behalf.  Exhibit 1, pgs. 214-215.

The only reason Mr. Sheehy gave for not submitting a proof of loss was that Nephrite overlooked CM Vantage's request.  Exhibit 1, pgs. 204 & 206; Exhibit 5, pg. 205.  Mr. Sheehy admitted that a proof of loss was not provided because he overlooked the request, not because CM Vantage did not provide blank forms.  Additionally, CM Vantage's corporate representative, Lynn Renlund, explained that while it would be helpful for Nephrite to submit a proof of loss on CM Vantage's forms, it is common for public adjusters to use their own proof of loss forms and CM Vantage would accept those as well.  Exhibit 2, pgs. 88-89.  Thus, contrary to its claims, Nephrite knew it was required to submit a proof of loss, but still failed to do so.

### B.        Nephrite failed to provide an estimate containing the amount of loss.

Claiming it was unnecessary, Nephrite admits it never provided CM Vantage with an estimate containing a dollar figure for its damages; however, this is exactly what the policy requires and CM Vantage requested.  Doc. #42, SOF 168.  The Duties In The Event Of Loss Or

Damage Condition of the policy requires Nephrite to provide "complete inventories of the damaged and undamaged property.  Include quantities, costs, values, and amount of loss claimed."  Exhibit 11, pgs. 13-14.  Pursuant to the policy, in its reservation of right letter, CM Vantage requested that Nephrite "provide all documentation and information that supports your claim."  Exhibit 32.  Additionally, during its investigation, CM Vantage repeatedly requested that Nephrite provide "any and all documents, including but not limited to estimates, invoices and work orders establishing the costs of repairs and/or any repairs performed to the subject property."  Exhibit 33; Exhibit 34; Exhibit 37.  Nephrite was thus expressly advised from the outset of the claim that the scopes lacking dollar figures from Mr. Abrams were insufficient.

Nephrite suggests that the scopes from Mr. Abrams, as well as the rent rolls, were all CM Vantage needed to adjust and pay this claim.[7]  However, CM Vantage never received an estimate from Nephrite's contractor or public adjuster for the cost of repairs containing a dollar amount. Exhibit 2, pgs. 33, 55-56, 57-58 & 85; Exhibit 5, pgs. 34 & 38-39.  Additionally, despite alleging that Mr. Abrams would have provided dollar figures if asked, Mr. Abrams failed to do so despite CM Vantage's numerous requests during the claim for an estimate establishing the cost of repairs, and even after suit was filed, he failed to provide a scope including pricing, as Nephrite then submitted estimates from Group Preservation Housing, LLC.[8]  Exhibit 5, pgs. 169-170, 172 & 189-90; Exhibit 30; Exhibit 33; Exhibit 34; Exhibit 37.

---

[7]  Nephrite's argument ignores the fact that during the claim and throughout the litigation, it was seeking property damages and lost rents for all 12 units of Building 9815, including Apartment 4.  Exhibit 1, pgs. 125-26, 153-62, 170, 172-73 & 191; Exhibit 27; Exhibit 28; Exhibit 29.  However, despite claiming damages for all 12 units, Nephrite in its summary judgment filings is now attempting to withdraw claims for Apartment 4.  Doc. ## 41-43.

[8]  It is important to note that Missouri courts have consistently held that compulsory discovery in a lawsuit is no substitute for an insured's original cooperation.  *Roller v. American Modern Home Ins. Co.*, 484 S.W.3d 110, 117 (Mo. Ct. App. 2015).  This is because it should not be necessary for an insurer to bear the expense of a lawsuit to enforce its rights to discovery of information pertaining to a claim.  *Id*. Consequently, it is wholly insufficient for Nephrite to allege that its production of documents and information in discovery cures its prior failures to cooperate.

20

Nephrite also seeks to justify its failure to comply with the policy's requirement that it submit an estimate for the cost of repairs by alleging that it invoked the appraisal condition. However, as CM Vantage noted in its reservation of rights letter, Mr. Abrams' attempted invocation of the appraisal condition was premature and ineffectual.   Exhibit 32, pg. 4. Specifically, it was not even possible for there to be an agreement or disagreement on the scope and amount of loss or damage by Friday, March 16, 2018, as CM Vantage's contractor, JS Held, was not able to inspect the property until March 20, 2018 and did not complete its first scope and estimate until April 6, 2018.  Exhibit 43; Exhibit 44.[9]

The insured is responsible for presenting its claim and CM Vantage needed information from Nephrite during the claim, including an estimate from its contractor or public adjuster setting forth the dollar amount it was seeking, but this was never received.  Exhibit 2, pgs. 29-30, 33, 55-58 & 84-85; Exhibit 5, pgs. 34 & 38-39.  CM Vantage was therefore unable to complete its investigation due to Nephrite's failure to cooperate and provide necessary information. Exhibit 1, pgs. 208-09 & 215-216; Exhibit 2, pgs. 16-17, 30, 34-35 71-77, 88-89 & 96-97; Exhibit 4, pgs. 38-39; Exhibit 38, pgs. 12-13; Exhibit 39, Numbers 65-66.

### C.      Nephrite failed to provide necessary documents and records.

In its reservation of rights letter, CM Vantage requested that Nephrite produce documentation and information that supports its claim.   Exhibit 32, pg. 5.  CM Vantage subsequently set forth detailed categories of documents and information being requested in its letters dated July 17, 2018, July 24, 2018 and September 21, 2018.  Exhibit 33; Exhibit 34; Exhibit 37.  Contrary to Nephrite's claims, CM Vantage's corporate representative confirmed

---

[9]  The alleged disparity between $1,000,000 and $500,000 is not only based on Mr. Abrams' scopes that contain no dollar figures, but also on JS Held's estimates that did not even exist until several weeks after Mr. Abrams' demand for appraisal was made.

that all of the documents and information were required by CM Vantage for its investigation. Exhibit 2, pgs. 34-35.  Even Nephrite's own expert, Donald Dinsmore, did not have a problem with and agreed that the overwhelming majority of documents and records being requested by CM Vantage were reasonable and appropriate.  Exhibit 5, pgs. 134-140 & 145-148; Exhibit 34.

Nephrite attempts to fault CM Vantage for not having it execute a financial authorization, but this argument is misguided.  A financial authorization would not have sufficed with respect to CM Vantage's request for information concerning the tenants, including leases and subsidies, as Mr. Dinsmore agreed CM Vantage would have to get that information from the insured. Exhibit 5, pgs. 62 & 78-79.  Thus, the documents being sought were not in CM Vantage's possession, were not attainable from other sources and were not irrelevant.  Additionally, as discussed in the preceding section, a financial authorization would not have relieved Nephrite of its responsibility to present its claim for the damaged property containing pricing, costs and values.  Exhibit 2, pgs. 29-30, 33, 55-58 & 84-85; Exhibit 5, pgs. 34 & 38-39.

Nephrite admits it did not provide requested documents and records by August 15, 2018, by September 7, 2018, by September 17, 2018, by September 21, 2018, five days prior to October 10, 2018 or by October 10, 2018.  Doc. #42, SOF 143, 144, 148, 149, 159, 160. Nephrite seeks to justify its wholesale refusal to respond to CM Vantage's requests for information which stretched from March through the middle of October by relying on a letter sent by Nephrite's prior counsel, Timothy Philipp.  Although Mr. Philipp sent a letter to CM Vantage on October 15, 2018, this was five days after the date of the rescheduled EUO, and constituted the first request for a conversation to discuss the scope and relevancy of the documents being sought by CM Vantage.  Exhibit M.  Nephrite fails to offer any justification for

its failure to respond to any of CM Vantage's prior requests for documents or records until the day CM Vantage filed the Declaratory Judgment action.  Doc. #1.

Nephrite claims it responded to all reasonable requests for information and provided all specified information.  These claims are manifestly false and directly contradicted by the undisputed facts.  Ultimately, CM Vantage was not able to pay this claim because Nephrite failed to cooperate by not providing reasonable and necessary information during the claim, including the documents that were requested, despite its obligation to do so.  Exhibit 2, pgs. 16-17, 30, 34-35, 71-74, 87 & 89; Exhibit 4, pgs. 37-38.

### D.    Nephrite refused to appear for an EUO.

Nephrite admits that no agent, representative or employee appeared for the EUO on October 10, 2018.  Doc. #42, SOF 156.  Despite this admission, Nephrite claims it never refused to appear for an EUO.  However, the mere act of not showing up, with no notice as to the reasons why, constitutes a refusal to appear for an EUO, especially considering that this was second date that had been set for the EUO.  Exhibit U, pgs. 141-42.  No response was received to CM Vantage's August 3, 2018, September 7, 2018[10] and September 21, 2018 communications by October 10, 2018, and neither Mr. Sheehy, nor any other agent, representative or employee from Nephrite, appeared for the EUO on October 10, 2018.  Exhibit 1, pg. 215; Exhibit 4, pgs. 38-39; Exhibit 5, pgs. 149-50; Exhibit 35; Exhibit 36; Exhibit 37; Exhibit 38; Exhibit 39, Numbers 61-62.  Nephrite did not respond in any manner, whether by phone call, e-mail or otherwise to CM Vantage's September 21, 2018 letter as of the date of the EUO, October 10, 2018, and further did not request that the EUO be cancelled, postponed or rescheduled for any reason.  Exhibit 38, pg.

---

[10]  Nephrite admits that the September 7, 2018 letter expressly advised that if the requested documents and records were not received within 10 days so that a mutually agreeable date could be selected for the EUO, then CM Vantage would proceed with setting the EUO.  Exhibit 36; Doc. #42, SOF 146.

12.    It was not until five days after the date of the EUO that Mr. Philipp for the first time sent CM Vantage a correspondence requesting a conversation to discuss the scope and relevancy of the documents being sought by CM Vantage.  Exhibit M.  Nephrite fails to offer any explanation for its failures to respond from August until October.  Thus, the absence of any mutual agreement on a date for the EUO was due to the persistent and continued lack of communication from Nephrite.

In a futile attempt to justify its failure to appear for the EUO, Nephrite seeks to claim that it never received the September 21, 2018 letter.  Nephrite alleges CM Vantage failed to provide any evidence that the letter was actually delivered to Mr. Philipp.  However, this is not true, as CM Vantage provided this Court not only with the letter, but also the e-mail from CM Vantage to Mr. Philipp to which the letter was attached, confirming the letter was sent to Mr. Philipp at 2:32 p.m. on September 21, 2018.[11]  Exhibit 37, pg. 7.  Further, Nephrite has failed to present any admissible evidence, or any evidence at all, supporting its allegation that the September 21, 2018 letter was not received by Mr. Philipp, such as an Affidavit from him that he never received the correspondence.  The absence of such evidence is fatal to Nephrite's concocted claim. Nephrite has presented nothing other than rank speculation, but the law is well established that simply showing some metaphysical doubt as to a material fact is insufficient to defeat summary judgment.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Nephrite also seeks to claim that an EUO was unnecessary and caused no prejudice to CM Vantage.  These claims are false.  Mr. Dinsmore admits that if there is evidence of a

---

[11] It should also be noted that while Nephrite seeks to dispute, without any support in the record, that the September 21, 2018 letter that was sent by e-mail was not received, Nephrite makes no such objection to the other communications CM Vantage sent by e-mail to Mr. Phillip on August 3, 2018 and September 7, 2018.  Doc. 42, SOF 140-146.  Further, the September 21, 2018 letter was sent to the same e-mail address, which was initially provided by Mr. Philipp, as the communications on August 3, 2018 and September 7, 2018 that Nephrite admits were received.  Exhibit 35; Exhibit 36; Exhibit 37.

misrepresentation in the procurement of insurance or in the claim then the claim is not owed at that time and that is an appropriate area for investigation by the insurance company.  Exhibit 5, pg. 33; Exhibit 45, pg. 153.  Mr. Dinsmore also concedes that if the insurance company learns of information during the investigation and adjustment of the claim that it did not previously know, as well as if there are issues concerning violations of the policy's conditions or misrepresentations, then that is an appropriate time to request documents and take an EUO. Exhibit 5, pg. 126; Exhibit 45, pg. 155.  Mr. Dinsmore acknowledges the coverage issues that existed, such as with respect to the subsidized housing and prior losses, should have been investigated by the insurance company.  Exhibit 5, pgs. 131-32.  Thus, an EUO was proper.

> **E.    Conclusion**

It was not reasonable or honest for CM Vantage to pay this claim and it was prejudiced and forced to file suit due to Nephrite's failures to cooperate.  Exhibit 2, pgs. 16-17, 30, 34-35, 74 & 89.

### CONCLUSION

For all the reasons contained herein, as well as in CM Vantage's Motion for Summary Judgment, Statement of Uncontroverted Material Facts, Memorandum in Support and Response to Defendant's Statement of Additional Disputed Material Facts, summary judgment should be entered in CM Vantage's favor.[12]

---

[12]   As set forth above, as well as in its prior summary judgment filings, CM Vantage is entitled to judgment as a matter of law due to Nephrite's material misrepresentations in the application and during the claim, as well as its failures to cooperate.  Consequently, Nephrite's counterclaims for declaratory judgment, breach of contract, vexatious refusal all necessarily fail as a matter of law.

25

Respectfully submitted,


/s/ Robert W. Cockerham
Robert W. Cockerham #31984
Ryan T. Knopf #63938
Cockerham & Associates, L.L.C.
10803 Olive Blvd.
St. Louis, MO 63141
314-621-3900
Fax:  314-621-3903
rcockerham@cockerhamlaw.com

Attorneys for Plaintiff CM Vantage
Specialty Insurance Company


## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2019, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing service on all counsel of record.


/s/ Robert W. Cockerham