UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CM VANTAGE SPECIALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | )       Case No. 4:18 CV 1749 JMB ) |
| NEPHRITE FUND 1, LLC, d/b/a Amber Glen Apartments, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on plaintiff's motion for summary judgment. Defendant has filed a response in opposition and the issues are fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Defendant Nephrite Fund I, LLC, (Nephrite) owns the Amber Glen Apartments complex in Raytown, Missouri.[1] Plaintiff CM Vantage Specialty Insurance Company (CM Vantage) [2] issued a policy of insurance to defendant Nephrite for the period August 2, 2017, to August 2, 2018. On March 1, 2018, a fire caused extensive damage to one of the Amber Glen apartment buildings and Nephrite submitted a claim for coverage. CM Vantage alleges that its investigation of the claim disclosed material misrepresentations in both Nephrite's application for insurance and

---

[1] Alan Sheehy purchased Amber Glen Apartments in 2007 and transferred ownership to defendant Nephrite in 2014. Alan Sheehy Deposition 1st Excerpts (Sheehy Dep. 1) at 22-23 [Doc. # 43-12]. The complex was managed by a third-party management company in 2014 and 2015. Mr. Sheehy and his manager Jesse Davila assumed management in 2016. Alan Sheehy Deposition 2nd Excerpts (Sheehy Dep. 2) at 67 [Doc. # 36].

[2] CM Vantage is a subsidiary of Church Mutual Insurance Company, created in 2016. Lynn Renlund Deposition at 8, 20 [Doc. # 36-1].

its claim for coverage.  CM Vantage also alleges that Nephrite failed to comply with the insurance policy's cooperation requirements.  Plaintiff brings this declaratory judgment action, pursuant to 28 U.S.C. §§ 2201-2202, seeking declarations that the policy is void ab initio and that defendant is barred from recovery under the policy.  Defendant asserts counterclaims for breach of contract, vexatious refusal to pay, and for declarations that the policy is not void and that plaintiff is obligated to provide coverage for the March 1, 2018 claim.

## I.    Background

As an initial matter, the Court notes that the parties have submitted more than 300 paragraphs of "undisputed" material facts (the majority of which are disputed) and more than 2,000 pages of exhibits.  Despite the vigor with which the parties present and defend their positions in this case, the issues are relatively straightforward: (1) whether the policy is void because defendant made material misrepresentations in its application for insurance; (2) whether the policy is void because defendant made material misrepresentations in its claim for coverage; and (3) whether coverage is precluded because defendant failed to cooperate with plaintiff's investigation as required by the policy.

### A.    Nephrite's Application for Insurance

In July 2017, Alan Sheehy met with Lonnie Kitchen, an independent insurance broker. Sheehy Dep. 1 at 60-61.  Based on information received from Sheehy, Kitchen completed an application for insurance, which Sheehy then signed.   Id. at 63 (testifying that Kitchen or his assistant typed the information and Sheehy reviewed and signed).

On July 24, 2017, Kitchen forwarded two applications[3] to Kevin Ware at RT Specialty on behalf of Nephrite.[4] One was the Commercial Insurance Application, referred to as the ACORD 125 (unsigned ACORD 125) [Doc. # 35-3]. A section regarding loss history required the applicant to list "all claims or losses (regardless of fault and whether or not insured) or occurrences that may give rise to claims for the prior 5 years." This section was left blank. Unsigned ACORD 125 at 3. The other application provided by Kitchen was the AmRisc Application/Schedule of Values (AmRisc Application)[5] [Doc. # 35-1]. The AmRisc Application sought information regarding three topics relevant to the present dispute: (1) Any "unrepaired damage from a recent loss," and the extent of any such damage; (2) any property losses within the last three to five years;[6] and (3) the percentage of "subsidized" rental units. The areas regarding the first two items were left blank while the form indicated that "0%" of Amber Glen's tenants received subsidies. AmRisc Application at 2. The application includes the following statement:

---

[3] These documents were not signed. According to plaintiff's expert witness Craig Andrews, "insurance agents routinely send unsigned application materials to multiple insurance companies and/or wholesale surplus lines brokers . . . and request pricing proposals for the insurance coverage described in the application materials. Craig Andrews Expert Witness Report at 10-11 [Doc. # 36-2]. Once an insurance client accepts a proposal, the agent asks the client to sign copies of the applications that were previously sent. Id.

[4] RT Specialty works directly with retail agents, such as Mr. Kitchen, rather than the insureds. The agents provide risk information which RT Specialty uses to negotiate coverage and terms with various insurance companies to obtain quotes for the agents to review. Kevin Ware Affidavit at ¶ 4 [Doc. # 49-2].

[5] The AmRisc Application is a document created by another insurer, AmRisc Insurance. It is common for "agents to have access to multiple insurance companies." Andrews Report at 20-21. Brokers often send insurance applications to multiple insurers. Tom Dassow Deposition at 32-33 (testifying that it is "not uncommon" for brokers to send applications to multiple carriers to get a quote) [Doc. # 36-2]. There are two copies of the AmRisc Application in the record. The copy attached to Keven Ware's affidavit at Doc. #49-2 is somewhat easier to read.

[6] The applicant is required to list: "Property losses min 3 years, prefer 5 years (DOL, Cause, Incurred $, ded, status). Warranted."

By submission of this application the insured and the agent represent that all information is true and correct to the best of their knowledge and that they have not deleted or altered the questions herein.

AmRisc Application at 1; Sheehy Dep. 1 at 98-99; see also id. at 144 (testifying that he understood that application information was material to insurer in deciding whether to issue policy and setting premium).

When asked about the AmRisc Application at deposition, Mr. Sheehy could not recall whether he ever saw the completed form.[7]  Sheehy Dep. 1 at 98 (stating "I do not remember seeing this document before.  I'm not saying I didn't, I just don't remember.").  With respect to the information contained in the application, however, he testified that he was not aware of any unrepaired damage from a recent loss or any losses within the last three to five years.  Id. at 110-11.  Elsewhere in his testimony, he acknowledged that there was a prior "mold incident" in 2016, but he did not consider this to be a "loss" for insurance purposes because the damage was remediated in the ordinary course of business and no insurance claim was submitted for this incident.  Id. at 49-52.  On the topic of subsidized housing, Sheehy acknowledged at deposition that at least some tenants received rental assistance from a local charitable organization known as SAVE, Inc., but he did not regard that assistance as a form of subsidy.  Id. at 69.

Mr. Ware emailed the AmRisc Application and ACORD 125 — without modifications — to Tom Dassow, a senior underwriter at CM Vantage.  See Kevin Ware Affidavit [Doc. # 49-2].  Mr. Ware informed Dassow that "there is no subsidized housing" and "[t]here have been no losses."  Email Ware to Dassow dated 7/25/17 [Doc. # 35-2 at 4].  After further exchanges, Dassow

---

[7] The AmRisc document is a print-out of a spreadsheet and does not require the insured's signature.  See AmRisc Application; Andrews Report at 20 (describing AmRisc document as a spreadsheet).  Thus, it is entirely plausible that Mr. Sheehy did not see the printed form before his deposition.

bound the policy, effective August 2, 2017.  Dassow Dep. at 22-24; Email Ware to Dassow 7/27/17 [Doc. # 35-2 at 1-2].

On August 8, 2017, Sheehy signed an ACORD 125 application completed by Mr. Kitchen.[8] Sheehy Dep. 1 at 63, 76-77; Signed ACORD 125 [Doc. # 35-6].  On the signed document, the check box indicating that there was no loss history was marked.  The following statement appears just above Sheehy's signature:

> THE UNDERSIGNED IS AN AUTHORIZED REPRESENTATIVE OF THE APPLICANT AND REPRESENTS THAT REASONABLE INQUIRY HAS BEEN MADE TO OBTAIN THE ANSWERS TO QUESTIONS ON THIS APPLICATION.  HE/SHE REPRESENTS THAT THE ANSWERS ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF HIS/HER KNOWLEDGE.

Id. at 4.  The form was forwarded to Tom Dassow at CM Vantage who determined that the information "confirmed the information that was presented to [him] earlier."  Dassow Dep. at 44.

Sheehy also signed a form entitled the Partners General Insurance Agency Habitational Supplemental Questionnaire.  [Doc. # 35-4].  Questions regarding the number of HUD or other subsidized units were left blank.  Sheehy testified that he told Kitchen there were no HUD or subsidized units at Amber Glen and that was what he intended to convey by leaving the questions blank.  Sheehy Dep. 1 at 96.  Because there is no evidence that the Habitational Questionnaire was forwarded to CM Vantage, the Court has not relied on the information contained in the document.  The same does not apply to Sheehy's testimony regarding the information in the form.

---

[8] There are two versions of the ACORD 125 in the record.  The version used for the unsigned application dates from July 2007, while the signed application was completed on a version from March 2016.  Compare Docs. # 35-3 and # 35-6.  Where the 2007 version specifically requested loss information for the prior five years, the 2016 version asked for "claims or losses . . . for the last ___ years."  This blank is not filled in on the signed ACORD 125.

**B.** **Relevant Policy Provisions**

**3.** **Duties In The Event Of Loss Or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

\* \* \*

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when, and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values, and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing, and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

      b.      We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

Policy [Doc. # 35-5 at 13-14].

The "Business and Institution Property Conditions" portion of the policy provides:

**A.    CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1.    This Coverage Part;
2.    The Covered Property;
3.    Your interest in the Covered Property; or
4.    A claim under this Coverage Part.

Id. at 65.

An endorsement entitled "Amendment — Common Policy Conditions" provides:

**C.    Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

Id. at 66.

**C.    <u>The Insured Property and the March 1, 2018 Fire</u>**

The Amber Glen Apartment complex has five separate structures, each of which consists of two buildings separated by a firewall. Each building has three levels with four apartments per level, for a total of 120 units in the complex. Sheehy Dep. 1 at 17. Alan Sheehy purchased Amber Glen Apartments in 2007 and transferred ownership to defendant Nephrite in 2014. Sheehy Dep. 2 at 22-23. The complex was managed by a third-party management company in 2014 and 2015. Mr. Sheehy and his manager Jesse Davila assumed management in 2016. Sheehy Dep. 1 at 67.

The March 1, 2018 fire was deliberately set in Unit 8 on the second floor of Building 9815. Fire Origin & Cause Report at 10 (Origin & Cause Report) (reporting that gasoline was poured on mattress in Unit 8 and ignited) [Doc. # 36-6]. The units directly below and above Unit 8 — Units 4 and 12, respectively — were heavily damaged. City of Raytown 8/1/18 Certificate of Inspection [Doc. # 35-9]. Following the fire, Building 9815 was uninhabitable.

Consultants retained by CM Advantage conducted two inspections of the fire site. The first, on March 7, 2018, was attended by Nephrite's public adjustor Paul Abrams,[9] CM Vantage's origin and cause inspector Phillip Keena, and CM Vantage's adjuster, Ron Goddard. See March 19, 2018 Report by Ron Goddard (Goddard Report 1) [Doc. # 35-10]. In addition to locating the source of the fire in Unit 8, the inspectors noted that all the sheetrock, cabinets, plumbing fixtures, and appliances had been removed from Unit 4. Id. at 3; Cause & Origin Report at 5. Keena and Goddard searched without success for debris that could have been removed from Unit 4. Goddard Report 1 at 3 (debris on patio not consistent with materials removed from Unit 4); Origin & Cause Report at 5 (missing materials not found in dumpsters). In the adjoining Building 9813, the inspectors noted that there were signs of a kitchen fire in Unit 12. Goddard Report 1 at 4.[10] Abrams stated that the interior condition of this apartment was not related to the March 1st fire in Building 9815. Id.; but see Phillip Keena Deposition at 29, 50 (Abrams told him that fire damage in this unit was related to March 1, 2018 fire) [Doc. # 36-7]. He also stated, however, that the fire department had forcibly opened several doors during the March 1st fire, and that Nephrite's claim

---

[9] Nephrite retained Paul Abrams on March 2, 2017. Engagement Letter [Doc. # 35-7]. Mr. Sheehy previously worked with Mr. Abrams on several other claims, including a prior fire loss. Sheehy Dep. 1 at 143-44.

[10] Amber Glen general manager Jesse Davila stated that there was a fire in Unit 12 in Building 9813 "several months" before the March 1, 2018 fire. Cause & Origin Report at 9. The Raytown Fire Department last responded to a fire in that unit in 2006. Phillip Keena Deposition at 53 [Doc. # 36-7].

included the doors, trim and hardware in Building 9813. Goddard Report 1 at 4. A second inspection on March 20, 2018, was attended by Ron Goddard and building consultant Tom Kohout on behalf of CM Vantage, and Paul Abrams and contractor Bill Koehler on behalf of Nephrite. April 11, 2018 Report by Ron Goddard (Goddard Report 2) [Doc. # 35-12]. Based on his inspection, Mr. Kohout opined that the doors in Building 9813 were probably damaged during the earlier fire in that building's Unit 12. Id. at 3.

### D.     Evidence of Unreported Prior Loss or Damage

As part of the claim investigation, Goddard obtained records from city inspector William Boyd, who completed two inspections of Unit 4 before the March 1, 2018 fire. Emails between Goddard and Boyd 3/27 to 3/28/18 [Doc. # 35-8]. On August 1, 2016, he inspected the unit, which was vacant at the time, after receiving a complaint. William Boyd Deposition at 24 [Doc. # 36-11]; 8/1/16 Certificate of Inspection [Doc. # 35-9]. Boyd noted the presence of "bad mold" in Unit 4, which he suspected was the result of an unchecked water leak from the unit above. Boyd Dep. at 24, 34-35 [Doc. # 36-11]; 8/1/16 Certificate of Inspection [Doc. # 35-9] (emphasis in original). The mold "was from the bottom of the sheetrock all the way up to the top" on multiple walls and was "probably . . . the most mold" he had ever seen. Boyd Dep. at 36, 34-35. When he next inspected Unit 4 on April 7, 2017, he noted that "[a]ll mold . . . had been corrected." 4/7/17 Certificate of Inspection. He clarified at his deposition that, while the sheetrock had been removed, there was "a lot of miscellaneous debris" in the unit which was being used as a storage shed. He could not state that there was absolutely no mold in the entire unit. Boyd Dep. at 26-27, 37. CM Vantage underwriter Tom Dassow testified that he would have declined the application if he had known about the mold in Unit 4. Dassow Dep. at 75-76 (testifying that he "could maybe deal with" mold under a leaky faucet, but not widespread mold).

Immediately after the March 1st fire, Boyd observed that Unit 4 was full of debris, had no sheetrock, and was "basically in the same condition" as when he had last inspected it in 2017. Boyd. Dep. at 41-42; 39-40 (plumbing was not properly hooked up or supported; electrical component was hanging from ceiling). Based on his observations, he listed Unit 4 as vacant at the time of the fire. 3/1/18 Certificate of Inspection. It is undisputed that the City of Raytown never issued any permits for repair work or completed an inspection for final occupancy for Unit 4 after Boyd's initial inspection in 2016. Deft. Resp. to Pl. SUMF at ¶¶ 103, 105.

Nephrite's representatives disputed that Unit 4 was gutted and unoccupied before the fire. During the inspections, Abrams reportedly told CM Vantage's consultants that the apartment was gutted after the fire to prevent mold.[11] Goddard Report 1 at 3. Jesse Davila, Amber Glen's general manager, also stated that all sheetrock and items had been removed from Unit 4 after the fire.[12] Cause & Origin Report at 9. In an email dated April 16, 2018, Sheehy stated that he could "gather witnesses as well as the contractors to attest that they gutted [Unit 4] post fire because of the fear of mold." The demolition "was an all day process so . . . I will have plenty of witnesses available to attest to the fact that the demo occurred AFTER the fire." Furthermore, he wrote, "I also took a photo of the completely filled [dumpster] . . . 2 days after the fire as further evidence," and that the remaining debris was piled up in the patio. Email dated 4/16/18 (emphasis in original) [Doc. # 35-13]. In addition, Nephrite produced rent rolls showing that Unit 4 was leased as of August

---

[11] Nephrite objects that this statement in Goddard's report is inadmissible hearsay. The Court need not consider this argument, however, because Nephrite concedes, first, that Jesse Davila also told the inspectors that Unit 4 was gutted after the fire and, further, that Sheehy insisted that he had witnesses who would "attest to the fact the demo [of Unit 4] occurred AFTER the fire." Deft. Resp. to Pl. SUMF ¶¶ 112-14 (emphasis in original).

[12] On March 26, 2018, Phillip Keena's office received an anonymous phone call from an Amber Glen employee who stated that he was paid to falsely tell the insurance company that Unit 4 was gutted after the fire. Keena Dep. at 66-68.

1, 2016. [Doc. # 42-3]. At his deposition in May 2019, Sheehy continued to assert that Unit 4 was occupied at the time of the fire and was only gutted afterwards. Sheehy Dep. 1 at 190-91 (testifying Unit 4 was occupied continuously from Aug. 1, 2016 until the fire and, further, that he would have authorized complete demolition after the fire); but see id.at 54-55 (drywall in Unit 4 removed in 2016 and not replaced before fire). A quote prepared for Nephrite in May 2019 estimated the cost to repair each of the 12 units at $82,574. Group Preservation Housing LLC Quote at 5-6 [Doc. # 35-18].

In response to CM Vantage's summary judgment motion, Nephrite withdrew its claim for coverage for Unit 4 and no longer disputes that Unit 4 remained unoccupied following Boyd's 2016 inspection. Alan Sheehy Affidavit at ¶ 7 [Doc. # 43-22]; Def. Resp. to Pl. SUMF at ¶¶ 101, 103, 105 [Doc. # 42]. As a result, Nephrite asserts that information regarding Unit 4's condition before the fire is no longer material. CM Vantage argues that Unit 4's condition is material to its contentions that Nephrite made misrepresentations in its application by concealing a prior loss and in its claim by seeking repair costs for the preexisting mold damage and lost rent for an unoccupied apartment.

## E.    Subsidized Housing

The record includes excerpts of several Amber Glen lease agreements. [Doc. # 36-8]. The lease agreement forms ask for the name of any agencies that are "assisting in whole or in part for the rent, deposit or other documentation," as well as the name and phone number of the tenant's case worker. See, e.g., id. at 40. CM Vantage argues that the inclusion of this information on the lease form is evidence that Nephrite routinely leased units in Amber Glen to tenants receiving subsidies.

Sheehy acknowledged at deposition that several of Amber Glen tenants received rental assistance from a local organization called SAVE, Inc. Sheehy Dep. 1 at 69, 184; <u>see</u> Andrews Rep. at 22-27 (detailing 12 lease agreements signed before Nephrite applied for insurance showing that tenants' rent would be paid in whole or in part by SAVE, Inc.). SAVE, Inc., defines itself as "a small government-funded rental assistance program." Sheehy Dep. 1 at 184. In October 2016, June 2017, and January 2017, Sheehy signed tenancy approval forms from SAVE, Inc. [Doc. # 36-8 at 52-54; 64-76; 116-17]. The following appears at the top of the form:

> REQUEST FOR TENANCY APPROVAL
> Rent Subsidy Programs
>
> Please note that this HUD form has been adopted for use by SAVE, Inc. for its rent subsidy program.

It was Sheehy's opinion that SAVE, Inc.'s assistance was not a subsidy. <u>Id.</u> at 69, 185. Sheehy interpreted "subsidized" to mean "something affiliated with HUD. . . [,] the Section 8 program or tax credits." <u>Id.</u> at 75. Nephrite expert Donald Roinestad opined that assistance from SAVE, Inc., did not constitute a subsidy because its criteria for admission are "quite different" from those for admission to HUD's Section 8 Housing Voucher Program. Donald Roinestad Expert Witness Report at 6 [Doc. # 43-1].

At the time Sheehy submitted his insurance application, seven Amber Glen tenants were receiving Section 8 vouchers from the Housing Authority of Kansas City (HAKC). HAKC tenant files [Docs. # 36-9 and # 36-10]; Deft. Resp. to Pl. SUMF ¶ 82. Alan Sheehy's signature appears on several documents in the Housing Authority records.[13] HAKC tenant files. Nonetheless, the

---

[13] While defendant concedes that a "signature purporting to be Alan Sheehy's appears on" the documents, it argues that there is no evidence to establish that he actually signed them. Deft. Resp. to Pl. SUMF at ¶ 83.

AmRisc Application affirmatively represented that Amber Glen had "0 percent" subsidized housing units, which Nephrite now concedes is incorrect. See Deft. Resp. at 5 [Doc. # 41].

Underwriter Dassow testified that subsidized housing presents greater risks than market-rate housing, in part, because property owners do not maintain the property to the same standards. Dassow Dep. at 60-62. He further testified that "the majority of our claims come from subsidized housing." Id. at 65. Dassow stated that he would have increased Nephrite's premium by roughly 20 percent if he had known that Amber Glen had subsidized housing units. Dassow Dep. at 66-67.

### F. Claim for Lost Rent for Unit 4

One component of Nephrite's insurance claim is lost rental income. On March 29, 2018, Paul Abrams indicated that Nephrite was seeking an advance for lost rent on all 12 units in Building 9815. See 3/29/18 Email Abrams to Goddard (asking what information Nephrite needed to supply in order to obtain an advance of $35,000 for lost rent on 12 units) [Doc. # 43-14]. The rent rolls that Nephrite provided showed that Unit 4 was occupied at the time of the fire pursuant to a two-year lease effective August 1, 2016. Rent rolls [Doc. # 42-3]. Nephrite now concedes that Unit 4 was unoccupied at the time of the fire.

### G. Nephrite's Cooperation with CM Vantage

On March 29, 2018, CM Vantage sent Sheehy a reservation of rights letter.[14] The letter stated that, after "reviewing the facts and circumstances surrounding the claimed loss, as well as the applicable insurance policy," CM Vantage had "concerns regarding the potential applicability

---

[14] The letter was mailed to Alan Sheehy at the address listed for Nephrite on the ACORD 125 and policy. [Docs. # 35-6; # 35-5]. It was returned as undeliverable. It was emailed to Mr. Abrams on April 16, 2018, and to Mr. Sheehy on April 17, 2018. CM Vantage Claims File [Doc. # 43-6]; email Ben Hodges to Sheehy [Doc. # 43-8].

of coverage." 3/29/18 Reservation of Rights Letter [Doc. # 35-19]. The letter also addressed "an additional issue . . . with respect to appraisal," arising from Nephrite's adjuster's "attempt to invoke the appraisal condition of the policy."[15] Id. at 4. This effort was "premature and ineffectual" because there had to be "a disagreement on the value of the property or amount of loss" before the appraisal condition could be invoked. As of the date of the letter, Nephrite had "not submitted a claim setting forth a specific amount of damages being claimed as a result of the fire" and, therefore, no disagreement existed. Id.

In the reservation of rights letter, CM Vantage also asked Sheehy to submit to an examination under oath. Reservation of Rights Letter at 5. On July 17, 2018, Robert Cockerham, counsel for CM Vantage, sent a letter requesting Sheehy to appear for such an examination on August 6, 2018. 7/17/18 Letter [Doc. # 35-20]. The letter also requested Nephrite to produce in advance 19 categories of documents, including lists of tenants, their leases, completed proof of loss forms, tax returns, and financial records. Id. On August 3, 2018, Nephrite's attorney Timothy Philipp informed Mr. Cockerham that he and Mr. Sheehy were not available for the examination on August 6th.[16] 8/3/18 Email [Doc. # 35-22]. In response, Mr. Cockerham emailed Mr. Philipp the reservation of rights letter and asked that the listed documents be provided no later than August 15th. Id. Nephrite did not provide the requested documents or otherwise respond and, on September 7, 2018, Cockerham asked Philipp to provide the documents within ten days so that the parties could select a new mutually agreeable date for the examination to occur. 9/7/18 Letter [Doc. # 35-23]. He further stated that, if the documents were not provided within ten days, CM

---

[15] In an email on March 10, 2018, Paul Abrams stated that, "If we don't have an agreement on the scope and amount of loss/damage by Friday 3/16/18, then this email retroactive to today, will act as the insured's written demand for appraisal. And I will be converting my contract, from that of an adjuster to an appraiser." Id.

[16] Mr. Philipp also asked Mr. Cockerham to provide him all documents that CM Vantage had supplied.

Vantage would "be forced to proceed with setting the [examination] accordingly." Id. Once again, Philipp neither responded or provided the requested documents. On September 21, 2018, Cockerham emailed Philipp a letter requesting Sheehy to appear for an examination under oath on October 10, 2018, and to provide the documents at least five days before.[17] 9/21/18 letter [Doc. # 35-24]. Philipp did not respond or produce documents and Sheehy did not appear for the examination under oath. Deft. Resp. to Pl. SUMF at ¶¶ 159-60. On October 15, 2018, Philipp emailed Cockerham renewing his request for documents provided by CM Vantage to Cockerham. He also asked for a discussion of "the scope and relevancy of the documents" CM Vantage was seeking. 10/15/18 letter [Doc. # 43-11]. He did not mention the October 10th examination.

CM Vantage also asked Sheehy to provide notarized proof of loss claims in the March 29, 2018 reservation of rights letter. 3/29/18 Reservation of Rights Letter at 5. Although the letter referred to "enclosed" forms, there is no evidence that CM Vantage actually enclosed proof of loss forms with the letter, either when it was mailed on March 29th or emailed on April 16th and 17th. Pl. Resp. to Def. SUMF ¶¶ 254-55; 258-59; 261; 263; 266-67 [Doc. # 49]. It is undisputed that Nephrite never submitted the proof of loss forms. Def. Resp. to Pl. SUMF ¶ 168.

Nephrite contends that it provided other documents from which CM Vantage could determine the amount of its claim. In particular, Nephrites cites three "scopes"[18] Paul Abrams

---

[17] Nephrite contends that there is no proof that Philipp received the September 21st letter, despite the fact that it was emailed to him just as the prior communications were and which Nephrite acknowledges were received. Deft. Resp. to Pl. SUMF at ¶¶ 147, 151-55; 9/21/18 letter at 7 (email from Cockerham to Philipp); see also ¶¶ 140, 142 (acknowledging letters were sent). In the absence of evidence — such as an affidavit — that Philipp did not receive the correspondence, the Court declines to speculate that this correspondence went astray.

[18] These scopes list for each room in Building 9815 the work to be completed and the square footage attributable to each item. See, e.g., Scope at 2-16 (showing work and materials for ceiling, walls, electrical, etc. for Unit 12) [Doc. # 35-15]. According to plaintiff's expert witness Craig Andrews, Abrams included the expenses to repair mold damage in Unit 4 in these scopes. Andrews Rep. at 35.

prepared in early March 2018 using an estimating program called Xactimate.[19] [Docs. # 35-15; # 35-16; # 35-17]; see also Donald L. Dinsmore Deposition 1st Excerpts (Dinsmore Dep. 1) at 35 (testifying about Xactimate program). One scope is 122 pages long; another is 314 pages long; the last one is 255 pages long. The documents do not include any dollar figures associated with the damages. Id. at 157. Sheehy was unable to explain what accounted for the different lengths of the three documents. Id. at 159-60; 162. Based on these scopes, Nephrite expert Donald Dinsmore opined that Nephrite's claim was for slightly more than $1 million. Donald Dinsmore Expert Witness Report at 10 [Doc. # 43-2].

On April 6, 2018, Tom Kohout, the construction consultant for CM Vantage, also generated two scopes using the Xactimate program. [Docs. # 49-4; # 49-5]. One scope lists the work to be done and the associated square footage, while the other lists the replacement and actual cash values for the materials and the labor costs. [Doc. # 49-5]. For the damage to building 9815, Kohout estimated Nephrite's replacement cost value at $550,877.72, and its actual cash value at $452,707.10. Id. at 171-73. This estimate excluded all costs to repair or replace doors in Building 9813. Goddard Report 2 at 4-5.

Additional facts will be included as necessary to address the parties' arguments.

## II.    Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute

---

[19] Mr. Sheehy described these documents as "the scope of damages, including fire, smoke, water, et cetera, attributable to the [fire]." Sheehy Dep. 1 at 154.

is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Anderson, 477 U.S. at 247. The non-moving party may not rest upon mere allegations or denials in the pleadings. Id. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248. The Court must construe all facts and evidence in the light most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant. Id. at 255.

### III.     Discussion

The summary judgment motion presents the following issues: (1) whether the policy is void because defendant made material misrepresentations in its application for insurance; (2) whether the policy is void because defendant made material misrepresentations in its claim; and (3) whether coverage is precluded because defendant failed to cooperate with plaintiff's investigation as required by a condition of the policy. After reviewing the record and determining whether there are genuine disputes of material facts, the Court answers all three questions in the affirmative. Thus, plaintiff is entitled to summary judgment.

#### A.     Misrepresentations in the Application

CM Vantage contends that Nephrite made material misrepresentations in the application with respect to subsidized units and prior losses. Under Missouri law, misrepresentation is an

affirmative defense and an insurer bears the burden of proof.  Smith ex rel. Stephan v. AF & L Ins. Co., 147 S.W.3d 767, 774 (Mo. Ct. App. 2004).

"An application for a policy of insurance is an offer, intended to be relied upon and to become a part of the contract when accepted."  Bearden v. Countryside Cas. Co., 352 S.W.2d 701, 705 (Mo. App. 1961).  Generally, an insurance company may avoid an insurance policy for a fraudulent misrepresentation or, as alleged here, a material misrepresentation in the application. Cent. Bank of Lake of the Ozarks v. First Marine Ins. Co., 975 S.W.2d 222, 225 (Mo. Ct. App. 1998) (citing Continental Cas. Co. v. Maxwell, 799 S.W.2d 882, 887–888 (Mo. Ct. App. 1990)). To avoid a policy based on a material misrepresentation, the insurance company must show "(1) the representation is warranted to be true, (2) the policy is conditioned upon its truth, (3) the policy provides that its falsity will avoid the policy, or (4) the application is incorporated into and attached to the policy."  Keystone Mut. Ins. Co. v. Kuntz, 507 S.W.3d 162, 167 (Mo. Ct. App. 2016) (citations omitted).  Here, CM Vantage relies on the third prong, citing the policy's "Concealment, Misrepresentation or Fraud" provision, which provides that the policy is void if the insured, "at any time, intentionally conceal[s] or misrepresent[s] a material fact concerning . . . [t]he Covered Property."

1.  Nephrite's Waiver Argument

Nephrite argues that CM Vantage waived its claims that the policy is void because it has not returned the premium[20] or indicated its willingness to do so in the event the Court declares the policy void.  According to Nephrite, under Missouri law, an insurer claiming that a policy is void ab initio must tender back to the insured the premium paid within a reasonable time of discovering

_____

[20] Nephrite paid a total premium of $22,549 for the policy at issue.  Pl. Resp. to Def. SUMF ¶ 307.

facts upon which that claim is based.  Deft. Resp. at 2-3.  In <u>Reliable Life Ins. Co. v. Bell</u>, 246

S.W.2d 371, 375 (Mo. App. 1952), on which Nephrite relies, the court stated:

> In the absence of a statute, an insurance company is not required to return or tender
> back the premiums received as a condition precedent to bringing a suit in equity to
> cancel a policy on the ground of fraud, though the court may require such tender as
> a condition to the entry of its decree.  Nor is a deposit in court of the premiums paid
> a condition precedent to maintaining the suit.  <u>See</u> 12 C.J.S., Cancellation of
> Instruments, §43, pg. 1003, which announces the rule, as follows:  "Whatever may
> be the rule at law on the subject, it is not essential to deposit in court the thing or
> the amount necessary to place defendant in sta[t]u quo, since the court is authorized
> under the prayer for general relief to dispose of the whole case on equitable terms,
> whether the amount is deposited in court or not."
>
> The above rule is applicable to suits for the cancellation of insurance policies. 12
> C.J.S., Cancellation of Instruments, § 44, p. 1013.

<u>Id.</u> at 376; <u>see also</u> <u>Starr Indem. & Liab. Co. v. Cont'l Cement Co.</u>, No. 4:11CV809 JAR, 2013

WL 1442456, at *15 (E.D. Mo. Apr. 9, 2013) (finding that "Missouri precedent does not require

returning the premiums prior to maintaining a suit for declaratory judgment").

Nephrite concedes that CM Vantage was not required to repay the premium before filing

suit, but argues that it has an obligation to "offer to do equity as a condition to the relief sought."

Deft. Resp. at 3-4 (citing <u>Reliable Life Ins.</u>, 246 S.W.2d at 376).  As defendant notes, the insurer

in <u>Reliable Life</u> deposited the premium into the court registry while the insurer in <u>Starr Indem.</u>

proclaimed itself willing to return the premium to the insured if it prevailed.  Nephrite argues that,

here, CM Vantage has not only refused to return the premium but seeks to recover its costs incurred

in investigating, adjusting and evaluating the claim, along with attorneys' fees.  Thus, Nephrite

implies, it is inequitable to allow CM Vantage to proceed on its claim that the policy is void.

Whether Nephrite is entitled to return of its premium or CM Vantage is entitled to its costs are

issues relevant solely to a determination of the equities that can be addressed in post-judgment

motions, and not entitlement to bring suit.  <u>See</u>  <u>Osterberger v. Hites Const. Co.</u>, 599 S.W.2d 221,

230 (Mo. Ct. App. 1980) ("[I]n an equitable action, the court has the inherent power to adjust equity between the parties."). The Court rejects Nephrite's assertion that CM Vantage has waived its claims.

2.     <u>Misrepresentation — Subsidized Units</u>

The AmRisc Application represented that Amber Glen had "0%" tenants receiving subsidized housing. Nephrite concedes that this information is incorrect.

Despite its admission, Nephrite argues that its misstatement in its application documents does not void the policy. First, Nephrite contends that there is "no admissible evidence" that Nephrite or its broker Lonnie Kitchen completed the form or sent it to CM Vantage.[21] In reply to Nephrite's argument, CM Vantage now submits the affidavit of Kevin Ware of RT Specialty. [Doc. # 49-2]. Mr. Ware attests that "Nephrite's application/marketing process" was handled in the "customary and typical" fashion for the insurance industry. That is, Nephrite and its agent, Lonnie Kitchen, completed the applications and forms and sent them to RT Specialty, who then sent them to various insurance carriers to obtain quotes. Ware sent the documents to Tom Dassow at CM Vantage without any modifications. Ware provides a copy of an email Mr. Kitchen sent him on July 24, 2017, stating: "Kevin, Attached are the SOV[22] and [ACORD] 125." Nephrite has not attempted to refute Mr. Ware's statements. Thus, the undisputed evidence establishes that the AmRisc Application was supplied by Nephrite acting through its broker.

Nephrite next contends that, even if Mr. Kitchen submitted the AmRisc form on its behalf, Nephrite itself is not responsible for any misrepresentations in the form. Nephrite cites <u>Russell v.</u>

---

[21] At deposition, Sheehy testified that he could not recall whether he had previously seen the AmRisc Application. He acknowledged that he provided the information that Lonnie Kitchen or his assistant then entered into the computer.

[22] The full name of the AmRisc Application is "AmRisc Application/Schedule of Values."

Farmers & Merchants Ins. Co., 834 S.W.2d 209, 216 (Mo. Ct. App. 1992), for the proposition that when "erroneous information on an application was supplied by someone other than the applicant, without the applicant's knowledge, the general rule is that the [insurer] waives or is estopped to rely on the false information in order to void the policy." Russell does not apply here because Sheehy testified that he told Kitchen there were no HUD or subsidized units at Amber Glen. Sheehy Dep. 1 at 96. Furthermore, it is undisputed that Kitchen acted on behalf of Nephrite. "Under Missouri law, when a broker . . . acts on behalf of an insured to shop around for insurance among multiple insurance companies, the broker is the agent of the insured." Mark Andy, Inc. v. Hartford Fire Ins. Co., 229 F.3d 710, 717 (8th Cir. 2000). And, "[a]ny mistakes made by the broker are attributable to its principal, the insured, and not to the insurance company." Id.

The evidence establishes that Nephrite knew that some Amber Glen tenants received subsidies within the meaning of the application documents and that it made misrepresentations of that fact in completing those applications. See Cova v. Am. Family Mut. Ins. Co., 880 S.W.2d 928, 931 (Mo. Ct. App. 1994) (lying about the very subject matter for which insurance is being purchased "constitutes misrepresentations of such material matters that no explanation other than an intent to deceive is plausible").

### 3. Materiality — Subsidized Units

Nephrite argues that its misrepresentations about subsidized housing were not material. In determining materiality, the inquiry is not whether the misrepresentation actually affected the insurer's decision. Smith *ex rel.* Stephan v. AF & L Ins. Co., 147 S.W.3d 767, 774 (Mo. Ct. App. 2004). A misrepresentation of fact is deemed material if the fact, stated truthfully, might reasonably have influenced the insurance company to accept or reject the risk or to have charged a different premium. Cent. Bank, 975 S.W.2d at 225 (citing Continental Cas., 299 S.W.2d at 889;

Farley v. St. Charles Ins. Agency, Inc., 807 S.W.2d 168, 170 (Mo. Ct. App. 1991); Weekly v. Missouri Property Ins. Placement Facility, 538 S.W.2d 375 (Mo. Ct. App. 1976)).  "In other words, in determining whether a particular misrepresentation in an insurance application is material, so as to void the policy *ab initio,* it must be determined whether truthful answers by the insured would have caused 'those engaged in the insurance business' to reject the risk or charge a higher premium."  Ins. Corp. of Hannover v. Vantage Prop. Mgmt., L.L.C., No. 04-1012-CV-W-SOW, 2006 WL 2385138, at *6 (W.D. Mo. Aug. 17, 2006) (quoting Mears v.. Columbia Mut. Ins. Co., 855 S.W.2d 389, 393 (Mo. Ct. App. 1993)).

In support of its contention that its misrepresentation regarding subsidies was not material in this case, Nephrite argues that "CM Vantage's own application" did not ask questions about subsidies and, thus, the presence of subsidized units could not have been material to CM Vantage's decision to insure or the premium it charged.  First, there is no document in the record that can be identified as "CM Vantage's own application."  Second, the AmRisc Application submitted by Nephrite did ask about subsidized housing.  But, Nephrite argues, that form did not define what it meant by subsidized housing.  Defense expert Roinestad opined that, if subsidies were "truly material," CM Vantage "would have (a) asked about it in the application, or (b) followed up, either with Nephrite directly or with its broker, to confirm what was considered a subsidy on the other insurance company's Statement of Value form."  Roinestad Report at 6-7.  However, "insurers and underwriters are entitled to rely upon the responses and information provided by potential insureds and to presume the insured has provided responses that are true and complete."  Cedar Hill Hardware & Const. Supply, Inc. v. Ins. Corp. of Hannover, 563 F.3d 329, 349 (8th Cir. 2009) (citing Prudential Prop. and Cas. Ins. Co. v. Cole, 586 S.W.2d 433, 436 (Mo. Ct. App. 1979)).  Furthermore, the evidence establishes that several Amber Glen tenants received subsidies from

SAVE, Inc., which described itself as a form of rental subsidy, and Section 8, which Roinestad acknowledged meets his definition of subsidized housing. Donald Roinestad Deposition 1st Excerpts (Roinestad Dep. 1) at 142 [Doc. # 36-5]. Thus, Nephrite knew that some of its tenants received subsidized housing, regardless of whether the AmRisc form defined the term.

Nephrite argues that rental subsidies could not have been material to CM Vantage because they were not addressed in written underwriting guidelines. At the time that Nephrite submitted its insurance application, CM Vantage did not have written underwriting guidelines. Dassow Dep. at 68 (testifying that CM Vantage was a startup and did not have an underwriting manual until August 2018); but see Primary and Excess Property Underwriting Manual (2018 Underwriting Manual) at 1 (noting "Last Updated: 2-5-17") [Doc. # 42-1]. As a "nonadmitted" insurance carrier, CM Vantage was not subject to the rules and regulations of state insurance regulators requiring written underwriting guidelines. See Donald Roinestad Deposition 2nd Excerpts (Roinestad Dep. 2) at 20-21 [Doc. # 49-1] (testifying that nonadmitted carriers are not penalized if they fail to have written underwriting guidelines); see also Andrews Rep. at 4 ("Non-admitted surplus lines insurers in Missouri such as [CM Vantage] are not required to maintain written underwriting guidelines."). Thus, no inference regarding the materiality of Nephrite's misrepresentations regarding subsidized housing can be drawn from the fact that CM Vantage did not have written underwriting guidelines when it received Nephrite's application.

Nephrite notes that the Underwriting Manual provides that, as of August 14, 2018, all new policies and renewals were limited to no more than 15% subsidized housing. Nephrite argues that, under this standard, its seven HUD subsidies would not have been material to CM Vantage's decision to accept Nephrite's application or the premium it would have charged.[23] This argument

_____

[23] In addition, at least 12 tenants received subsidies through SAVE, Inc.

ignores the fact that prior to August 14, 2018, the decision regarding subsidized housing was subject to "underwriter discretion." Underwriting Manual at 26. Sheehy's belief that the term "subsidy' was limited to assistance from HUD, Section 8, or tax credits does not create a factual dispute with regard to whether Amber Glen provided subsidized housing at the time Nephrite applied for insurance. And, Mr. Roinestad's opinion that Section 8 and SAVE, Inc., have different criteria for admission is irrelevant to whether the assistance provided by the latter constitutes a subsidy.

Generally, the question of whether the misrepresentations in an application were material is one for the trier of fact to decide. Mears v. Columbia Mut. Ins. Co., 855 S.W.2d 389, 395 (Mo. Ct. App. 1993). "However, when a misrepresentation is of such a nature that all minds would agree that it is or is not material, the question is appropriately considered to be a question of law for the court." Id. Here, CM Vantage underwriter Dassow testified that he would have increased Nephrite's premium had he known that it had subsidized tenants. Dassow Dep. at 61. Defense expert Donald Roinestad agreed that subsidized housing is "something that an insurance company would want to know about" and, further, that an underwriter might choose not to "write" the policy at all or to do so for a higher premium. Roinestad Dep. 1 at 79, 141. The Court finds as a matter of law that the presence of subsidized housing was a material matter for the purposes of insuring Amber Glen.

In summary, the Court finds that CM Vantage is entitled to summary judgment on its claim that the policy is void ab initio because Nephrite intentionally misrepresented the percentage of subsidized units in its application for insurance.

### B. Misrepresentations in the Claims Process

In the alternative, CM Vantage seeks a declaration that the policy is void because Nephrite made material misrepresentations in the claims process. Specifically, Nephrite submitted a claim for repairs and lost rent for Unit 4, which it now concedes was unoccupied at the time of the fire. Under Missouri law, "a misrepresentation as to a portion of the loss may void coverage to the entire claim." Liberty Mut. Fire Ins. Co. v. Scott, 486 F.3d 418, 423 (8th Cir. 2007) (quoting Childers v. State Farm Fire & Cas. Co., 799 S.W.2d 138, 141 (Mo. Ct. App. 1990)).

Nephrite argues that there is evidence that its inclusion of Unit 4 in its claim "was the result of a mistake rather than a deliberate attempt at fraud." Deft. Resp. at 14. As an initial matter, CM Vantage is not required to prove the elements of fraud because the policy's misrepresentation clause provides that it is rendered void for intentional concealment or misrepresentation of a material fact. See Neidenbach v. Amica Mut. Ins. Co., 96 F. Supp. 3d 925, 930 (E.D. Mo. 2015) ("[D]espite the reference to the term "fraud" in most misrepresentation clauses, the insurer is not required to prove the elements of fraud to avoid coverage if the policy language also indicates, as here, that the policy is rendered void for intentional concealment or misrepresentation of a material fact.").

Nephrite argues that there is a factual dispute regarding whether its inclusion of Unit 4 in the claim was merely a mistake. In support, Nephrite cites rent rolls showing that the apartment was rented and Sheehy's testimony that he was not personally familiar with the condition of all the units. Less than a week after the fire, however, both Paul Abrams, Nephrite's public adjustor, and Jesse Davila, Amber Glen's manager, stated that Unit 4 was gutted after the fire.[24] Furthermore, Sheehy purported to have witnesses, including contractors, who would testify that

---

[24] As noted above, Nephrite objects to any reliance on any purported statement by Abrams as inadmissible hearsay, while conceding that Davila represented that all items and sheetrock were removed after the fire.

the apartment was gutted after the fire, and claimed to have taken a photo of the debris removed from the unit "AFTER the fire." 4/16/18 email Sheehy to Kitchen (emphasis in original). These affirmative misrepresentations about when the unit was gutted negate any argument that Nephrite made a mistake about Unit 4's condition at the time of the fire.

CM Vantage is entitled to summary judgment on its claim that the policy is void ab initio because Nephrite made intentional misrepresentations in its claim for coverage.

### C.      Breach of Cooperation Clause

Missouri courts have consistently acknowledged an insurer's right to a complete investigation of a claim, including examinations, and have found that the insured's failure to assist in the investigation precludes any coverage. Roller v. Am. Modern Home Ins. Co., 484 S.W.3d 110, 116 (Mo. Ct. App. 2015) (citing Union Ins. Co. of Providence v. Williams, 261 F. Supp. 2d 1150, 1152 (E.D. Mo. 2003)). "Cooperation clauses are designed to 'enable the [insurance] company to possess itself of all knowledge, and all information as to other sources of knowledge, in regard to facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims.'" Chaudhri v. State Auto Prop. & Cas. Ins. Co., No. 4:17-CV-00703-DGK, 2019 WL 1519307, at *3 (W.D. Mo. Apr. 8, 2019) (quoting Wiles v. Capitol Indem. Corp., 215 F. Supp. 2d 1029, 1032 (E.D. Mo. 2001) (citations omitted, alteration in original). "Once the insurer proves the material breach of a cooperation clause, the insurer may deny liability coverage under the policy." Union Ins., 261 F. Supp. 2d at 1152. To successfully deny coverage, "the insurer must prove (1) the existence of substantial prejudice and (2) the exercise of reasonable diligence to secure the insured's cooperation." Id. Prejudice can be established when the insured fails to comply with a reasonable examination request because the insured has "perhaps the greatest

knowledge of the circumstances[.]" <u>Roller</u>, 484 S.W.3d at 116 (quoting <u>In re</u> <u>Am. Wood Concepts,</u> <u>LLC</u>, No. 08–50791, 2010 WL 1609690, at *4 (Bankr. W.D. Mo. Apr. 20, 2010)).

Nephrite argues that it never refused to sit for an examination under oath; rather, "it simply was waiting for its counsel to work out an appropriate scope of document production with CM Vantage." Def. Opp. at 22. But, it is undisputed that Nephrite and its counsel did not appear for the examination scheduled for October 10, 2018; nor did it request that the examination be rescheduled. Indeed, Mr. Philipp, counsel for Nephrite, did not communicate with Mr. Cockerham, counsel for CM Vantage, at any time between August 3, 2018 — when he stated that Nephrite would not appear for examination on August 6th — and October 10th. In that interval, CM Vantage sent three separate communications to Mr. Philipp, all of which went unanswered. And, there is no evidence in this record that counsel raised an objection to the scope of documents CM Vantage requested prior to October 10th.

Nephrite argues that there is no proof that it received the September 21, 2018 letter setting the examination for October 10th. That is incorrect. The letter was emailed to Mr. Philipp at the email address he provided and to which the two prior letters were emailed. 9/21/18 letter at 7 (email from Cockerham to Philipp); Deft. Resp. to Pl. SUMF ¶¶ 140, 142 (acknowledging letters were sent on 8/3 and 9/7). In the absence of evidence — such as an affidavit — that Philipp did not receive the correspondence, the Court declines to speculate that this correspondence went astray.

Nephrite also asserts that the examination under oath was unnecessary and caused no prejudice to CM Vantage. In support of this assertion, Nephrite cites the opinion of expert Donald Dinsmore that, "once owner-related arson was no longer suspected as a potential cause" of the fire, the examination "process is no longer necessary if the insurer has properly investigated."

Dinsmore Report at 9-10. Mr. Dinsmore acknowledged at deposition, however, that an examination under oath is appropriate when there are "misrepresentation issues." Donald Dinsmore Deposition 2nd Excerpts (Dinsmore Dep. 2) at 155 [Doc. # 49-6]. He further acknowledged that there were coverage issues present in this case, including substantial compliance with policy conditions. Dinsmore Dep. 1 at 133. Indeed, Dinsmore testified that it was CM Vantage's request for documents, not the examination, with which he took issue. Id. However, "[c]ompliance with an examination request is not generally contingent on disputes over the scope of document requests." Roller, 484 S.W.3d at 117. And, in this case, Nephrite did not communicate its disagreement regarding the scope of CM Vantage's document request until after it failed to appear for the scheduled examination.

CM Vantage is entitled to summary judgment on its claim that Nephrite breached the cooperation provision of the policy.

* * * * *

In conclusion, the Court finds that CM Vantage is entitled to summary judgment on its claim the policy is void ab initio because Nephrite made intentional misrepresentations in its application for insurance and in its claim for coverage. The Court also finds that CM Vantage is entitled to summary judgment that Nephrite breached the cooperation requirement of the policy by failing to appear for examination under oath. The Court's finding also entitles CM Vantage to summary judgment on Nephrite's counterclaims for declaratory judgment, breach of contract, and vexatious refusal to pay.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of plaintiff CM Vantage Specialty Insurance Company for summary judgment [Doc. # 33] is granted.

**IT IS FURTHER ORDERED** that this matter is removed from the March 23, 2020 trial docket.

A separate Judgment in accordance with this Memorandum and Order will be entered.




*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of February, 2020.